# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHERI CLEARWATER, derivatively on behalf of U.S. BANCORP,<br><br>      Plaintiff,<br><br>      v.<br><br>ANDREW CECERE, TERRY DOLAN, JODI RICHARD, KATHERINE QUINN, WARNER L. BAXTER, DOROTHY J. BRIDGES, ELIZABETH L. BUSE, KIMBERLY N. ELLISON-TAYLOR, KIMBERLY J. HARRIS, ROLAND A. HERNANDEZ, RICHARD P. MCKENNEY, YUSUF I. MEHDI, JOHN P. WIEHOFF, and SCOTT W. WINE,<br><br>      Defendants,<br><br>      and<br><br>U.S. BANCORP,<br><br>      Nominal Defendant. | Case No.: 1:24-cv-00241<br><br><br>**DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Cheri Clearwater ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant U.S. Bancorp ("USB" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Andrew Cecere ("Cecere"), Terry Dolan ("Dolan"), Jodi Richard ("Richard"), Katherine Quinn ("Quinn"), Warner L. Baxter ("Baxter"), Dorothy J. Bridges ("Bridges"), Elizabeth L. Buse ("Buse"), Kimberly J. Harris ("Harris"), Roland A. Hernandez ("Hernandez"), Richard P. McKenney

("McKenney"), Yusuf I. Mehdi ("Mehdi"), John P. Wiehoff ("Wiehoff"), and Scott W. Wine

("Wine") (collectively, the "Individual Defendants," and together with USB, "Defendants")

for breaches of their fiduciary duties as directors and/or officers of USB, unjust enrichment,

abuse of control, gross mismanagement, waste of corporate assets, violations of Sections

14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for

contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint

against the Individual Defendants, Plaintiff alleges the following based upon personal

knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other

matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's

attorneys, which included, among other things, a review of the Defendants' public documents,

conference calls and announcements made by Defendants, United States Securities and

Exchange Commission ("SEC") filings, wire and press releases published by and regarding

USB, legal filings, news reports, securities analysts' reports and advisories about the

Company, and information readily obtainable on the Internet. Plaintiff believes that

substantial evidentiary support will exist for the allegations set forth herein after a reasonable

opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing

committed by the Individual Defendants from August 1, 2019, to the present (the "Relevant

Period")[1].

---

[1] The materially misleading statements and/or omissions were published in USB's public filings with the SEC and in press releases from approximately August 1, 2019 to July 28,

2.      USB is a Delaware corporation with principal executive offices in Minneapolis, Minnesota. The Company offers a wide range of financial services like lending and depository services, cash management, and capital markets. USB also provides credit card services, merchant and ATM processing, mortgage banking, insurance, brokerage, and leasing. The Company has a banking subsidiary, U.S. Bank National Association ("U.S. Bank"), which engages in general banking operations. The Company is the publicly traded parent company of U.S. Bank.

3.      During the Relevant Period, Defendants repeatedly represented to the investing public through the Company's SEC filings and press releases that the Company's "culture, brand and reputation are sources of competitive advantage" and "differentiate [the Bank] from [it's] peers." Among other things, they represented that this "advantage" included core values like "ethics," "trust," "honesty," and "customer transparency." In addition, Defendants continued to tout the Company's designation as one of the "World's Most Ethical Companies" in various of its SEC filings and in investor presentations throughout the Relevant Period.

4.      However, these statements were false and misleading, as the Company's practices included abusive and deceptive conduct which was designed to artificially inflate the Company's financial results. Indeed, during the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by participating in and/or causing the Company to participate in, *inter alia*, the following: (a) U.S. Bank pressuring its

---

2022; however, the wrongdoings complained within this complaint continue to the present as the Company's internal controls remain deficient.

employees to improve Company sales by opening credit cards, lines of credit, and depositing accounts without the knowledge and consent of the consumers and without the legally required consumer disclosures; (b) the Company utilizing an incentive-compensation program that rewarded managers and their subordinate employees for encouraging customers to purchase new products, typically in the form of unauthorized lines of credit attached to consumer checking accounts improperly sold to consumers as overdraft protection; (c) since at least 2010, the Company and U.S. Bank had knowledge of such unauthorized conduct and that this misconduct violated relevant regulations and laws intended to protect consumers, including the Consumer Financial Protection Act of 2010 ("CFPA"), the Truth in Lending Act ("TILA"), Truth in Savings Act ("TISA") and Fair Credit Reporting Act ("FCRA"); and (c) the Company's Board of Directors (the "Board") failed to properly maintain internal controls to prevent its employees from participating in such unlawful actions, identify and stop the misconduct, and remediate affected consumers (collectively, the "Account Misconduct").

5.     The truth began to emerge on July 28, 2022 when the Consumer Financial Protection Bureau ("CFPB") issued a Consent Order and fined U.S. Bank $37.5 million for unlawfully exploiting consumers' personal data to open fake accounts for unsuspecting customers in violation of the CFPA, TILA, TISA, and FCRA. In response to these violations, CFPB Director Rohit Chopra stated that "'[f]or over a decade, U.S. Bank knew its employees were taking advantage of its customers by misappropriating consumer data to create fictitious accounts.'" An investigation conducted by the CFPB further found "specific evidence that revealed that U.S. Bank was aware that sales pressure was leading employees to open accounts

4

without authorization, and the bank had inadequate procedures to prevent and detect these accounts."

6.      On this news, the price per share of USB stock fell 4% to close at $46.12 per share on July 28, 2022.

7.      One week later, the United States Senate Committee on Banking, Housing, and Urban Affairs (the "Senate Banking Committee") sent a letter to Defendant Cecere about the Company's "concerning" misconduct coming on the heels of a similar fake accounts scandal plaguing Wells Fargo. The Senate Banking Committee noted the CFPB's findings that U.S. Bank used an incentive compensation program to incentivize employees to "engage[] in unlawful activity by utilizing customers' personal identifying information to open deposit accounts, apply for and issue credit cards, and open lines of credit," which "accrued fees and increased profits" and which the CFPB found "violated federal consumer laws and violated individual consumers' control over their data privacy." The Senate Banking Committee asked the Company for detailed information regarding the misconduct and indicated that it would further scrutinize Defendant Cecere at the Annual Wall Street Oversight Hearing in September 2022. At the hearing, Defendant Cecere ***admitted*** to the dishonorable and unlawful conduct of USB and its employees, stating: "***I take full responsibility that we did open up unauthorized bank accounts. It was going back to 2010.*** It's unacceptable. It's inconsistent with our principles and procedures as well as our ethics."[2]

8.      Still, despite the truth regarding the Company's misconduct and deficient internal controls beginning to emerge, the Defendants continued to make false and misleading

---

[2] Any emphasis throughout this complaint has been added unless otherwise noted herein.

statements touting the Company's commitment to ethics and the Board's role in risk oversight. At the same time, the Defendants failed to disclose that internal controls at the Company remained deficient and, due to the foregoing, the Company remained at a heightened risk for additional regulatory scrutiny, including by the CFPB and the Office of the Comptroller of the Currency ("OCC").

9.    The truth fully emerged on December 19, 2023 when the CFPB issued a press release announcing that the "(CFPB) today ordered U.S. Bank to pay ***nearly $21 million for keeping out-of-work consumers from accessing unemployment benefits*** at the height of the COVID-19 pandemic." The press release further revealed that U.S. Bank "froze tens of thousands of accounts" but "failed to provide people a reliable and quick way to regain access." (collectively, the "Consumer Misconduct"). The CFPB's order required U.S. Bank to pay $5.7 million to consumers and a $15 million penalty to the CFPB.

10.    Separately, the OCC fined U.S. Bank $15 million for the aforementioned misconduct, after the CFPB and OCC coordinated to investigate U.S. Bank's illegal conduct.

11.    Throughout the Relevant Period, the Defendants breached their fiduciary duties to the Company when they made materially false and/or misleading statements and failed to disclose material adverse facts about USB's business, operations, and prospects. In particular, Defendants failed to disclose to shareholders and investors, *inter alia*, that: (a) the Company was engaging in the Account Misconduct and the Consumer Misconduct; (b) due to the foregoing, USB faced a foreseeable risk of greater regulatory scrutiny or investigation; (c) the Company's revenues were in part the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above,

the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing USB to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between August 2019 and July 2022, approximately 107 million shares of USB common stock were repurchased, costing the Company approximately $6.032 billion. Since Company's stock was actually worth only $46.12 per share, the price at closing on July 28, 2022, the Company significantly overpaid for the repurchases of its own stock.

13.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, four of the Individual Defendants sold Company shares at inflated prices, netting proceeds of over $26 million.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls and participated in and/or facilitated the Company's participation in the Account Misconduct and the Consumer Misconduct.

15.     In light of the Individual Defendants' misconduct—which has subjected USB and its Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), Chief Risk Officer, and former Chief Administrative Officer ("CAO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further

subjected the Company to the need to remedy the Account Misconduct and the Consumer Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, a $37.5 million fine from the CFPB for the Account Misconduct, over $36 million in penalties to the CFPB and OCC for the Consumer Misconduct, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16.    USB has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the collective engagement in and/or facilitation of the Company's engagement in the Account Misconduct and the Consumer Misconduct, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Cecere, Dolan, Richard, and Quinn's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections

10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## **PARTIES**

### **Plaintiff**

22.     Plaintiff is a current shareholder of USB. Plaintiff has continuously held USB common stock since first purchasing the stock on September 21, 2020.

### **Nominal Defendant**

23.     USB is a Delaware corporation with its principal executive offices at 800 Nicollet Mall, Minneapolis, MN, 55402-7020. USB's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "USB."

### **Defendant Cecere**

24.     Defendant Cecere has served as USB's President since January 2016, as a Company director since 2017, as CEO since April 2017, and as Chairman of its Board since

April 2018. He also serves as Chair of the Executive Committee and as a member of the Capital Planning and Risk Management Committees. According to the Company's Schedule 14A filed with the SEC on March 7, 2023 (the "2023 Proxy Statement"), as of February 3, 2023, Defendant Cecere beneficially owned 827,737 shares of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on February 3, 2023 was $46.69, Defendant Cecere owned approximately $38.6 million worth of USB stock.

25.    For fiscal years 2019, 2020, 2021, and 2022, Defendant Cecere received $18,785,026, $16,752,753, $19,166,276, and $16,157,514 in total compensation from the Company, respectively.

26.    The 2023 Proxy Statement said the following about Defendant Cecere:

Business experience: Mr. Cecere, 62, is the Chairman, President and Chief Executive Officer of U.S. Bancorp. He has served in this position since April 2018. He served as President and Chief Executive Officer from April 2017 to April 2018, as well as President and Chief Operating Officer from January 2016 to April 2017, after having served as Vice Chairman and Chief Operating Officer from January 2015 until January 2016. From February 2007 until January 2015, Mr. Cecere served as U.S. Bancorp's Vice Chairman and Chief Financial Officer, after having served as Vice Chairman, Wealth Management and Investment Services of U.S. Bancorp since the merger of Firstar Corporation and U.S. Bancorp in February 2001. Previously, he had served as an executive officer of U.S. Bancorp before its merger with Firstar, including as Chief Financial Officer from 2000 through 2001.

Other public company directorships: Donaldson Company, Inc. from 2013 to 2021.

Skills and qualifications:
**Chief executive experience:** As CEO of U.S. Bancorp, Mr. Cecere brings to all Board discussions and deliberations deep knowledge of our company and its business, which is particularly important following the acquisition of MUFG Union Bank.

**Corporate governance:** Through his current experience as our Chairman and through his current and past experience on public company boards, Mr. Cecere brings valuable corporate governance experience to our Board.

**Financial reporting and accounting:** Through his service on the audit committee of a public company, as well as his past experience as CFO of U.S. Bancorp, Mr. Cecere brings valuable financial reporting and accounting expertise to our Board.

**Financial services industry expertise:** Mr. Cecere has deep expertise in the financial services industry, gained through a career of more than 37 years at U.S. Bancorp.

**Risk management:** Mr. Cecere brings to our Board valuable risk management expertise gained through his work as CFO, Chief Operating Officer, and then CEO of U.S. Bancorp during the challenging regulatory and market environment of recent years.

### Defendant Dolan

27.     Defendant Dolan has served as the Company's Vice Chair since April 2010 and as its CAO since 2023. According to the 2023 Proxy Statement, as of February 3, 2023, Defendant Dolan beneficially owned 85,948 shares of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on February 3, 2023 was $46.69, Defendant Dolan owned approximately $4 million worth of USB stock.

28.     For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Dolan received $6,511,517, $6,586,238, $7,159,658, and $6,828,538 in total compensation, respectively.

29.     The Company's website states the following about Defendant Dolan:

Terry Dolan is vice chair and chief administration officer (CAO) of U.S. Bancorp, a financial services holding company with businesses across the United States, Canada and Europe. U.S. Bancorp is headquartered in Minneapolis and is the parent company of U.S. Bank, which is the fifth-largest

commercial bank in the United States. U.S. Bancorp is also the parent company of Elavon, a leader in the payment processing industry.

Terry became CAO of U.S. Bancorp in 2023; his role includes oversight of finance, corporate strategy, marketing, analytics, corporate social responsibility, digital capabilities and growth, public affairs and communications. He previously served as vice chair, chief financial officer, as well as vice chair of Wealth Management and Investment Services, executive vice president and controller. Under his leadership we have focused on driving growth, digital transformation and reinforcing our strong financial position, with our returns on assets and equity among the highest in the industry.

Terry also has been a leader in our community development work and our investments in affordable housing, economic development and renewable energy tax credit financing. He has been actively involved in numerous community organizations that provide services to the homeless, arts and culture, and higher education. He has a bachelor's degree from the University of St. Thomas.

**Defendant Richard**

30.     Defendant Richard has served as the Company's Vice Chair and Chief Risk

Officer since October 2018.

31.     The Company's website states the following about Defendant Richard:

Jodi Richard is vice chair and chief risk officer of U.S. Bancorp, a well-respected financial services holding company with businesses across the United States, Canada and Europe. U.S. Bancorp is headquartered in Minneapolis and is the parent company of U.S. Bank, which is the fifth-largest commercial bank in the United States. U.S. Bancorp is also the parent company of Elavon, a leader in the payment processing industry. Jodi oversees all aspects of the company's risk management activities, including operational risk, credit risk, market risk, model risk, compliance, AML/BSA, independent risk review and regulatory services. She became vice chair and chief risk officer in 2018 and is a member of the company's Managing Committee, the highest-ranking executives within the organization.

Jodi's financial career spans nearly 30 years. She joined U.S. Bancorp in 2014 as executive vice president and chief operational risk officer, managing the company's operational risk management activities.

12

Before joining U.S. Bancorp, Jodi was executive vice president and head of operational risk and internal control for HSBC North America. She was there for 11 years, serving in enterprise risk roles including head of risk governance and administration and director of regulatory compliance.

Jodi also spent 12 years at the Office of the Comptroller of the Currency (OCC), where she served as national bank examiner, specializing in retail credit and credit card bank supervision. Between two periods with the OCC, she was chief compliance officer for Sears National Bank.

At U.S. Bancorp, Jodi is executive sponsor of Business Resource Group Board. She also is the executive sponsor of U.S. Bank Spectrum LGBTQ BRG and Women of Risk chapter of the U.S. Bank Women BRG.

Jodi serves on the boards of Fairview Health Services and Catholic Charities of St. Paul and Minneapolis. She is active in the financial service industry, serving on the board of directors of the Risk Management Association and on the Advisory Committee for Minnesota Center for Financial and Actuarial Mathematics. She is a frequent speaker at risk industry events.

Jodi is a graduate of the Leading Women's Executive program and was part of American Banker's Most Powerful Women in Banking Top Team Award in 2013, 2015, 2019 and 2020. She was named Best Technology Executive in 2017 by Waters Technology. In 2017, U.S. Bank was named Operational Risk Bank of the Year by Risk.net.

Jodi holds a bachelor of arts degree in finance from the University of Northern Iowa.

**Defendant Quinn**

32.    Defendant Quinn served as Vice Chair and CAO of USB from April 2017 until she retired in April 2023. Defendant Quinn also served in various roles at USB, including as Executive Vice President and Chief Strategy, Marketing and/or Reputation Officer, from September 2013 to April 2017, and has served on the Managing Committee since 2015.

**Defendant Baxter**

33.    Defendant Baxter has served as a USB Board member since December 2015 and is Chair of its Audit Committee and a member of its Executive and Compensation and Human Resources Committees.

34.    For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Baxter received $305,980, $226,151, $279,500, and $306,026 in total compensation from the Company, respectively. According to the 2023 Proxy Statement, for the fiscal year 2022, Defendant Baxter's total compensation consisted of $146,000 in fees earned or paid in cash and $160,026 in stock awards.

35.    The 2023 Proxy Statement said the following about Defendant Baxter:

Business experience:  Mr. Baxter, 61, is the Executive Chairman and Former Chairman, President and Chief Executive Officer of Ameren Corporation, a regulated electric and gas utility company serving customers in Missouri and Illinois. He has served as the Executive Chairman since January 2022. Prior to his current role, Mr. Baxter served as Chairman, President and Chief Executive Officer of Ameren Corporation from 2014 to January 2022. Mr. Baxter also serves as the Chairman of the Edison Electric Institution, an association representing all U.S. investor-owned electric companies. He has served in this role since June 2022 and was Vice Chairman from 2020 to 2022. Mr. Baxter served as Chairman, President and Chief Executive Officer of Ameren Missouri from 2009 to 2014 and as Executive Vice President and Chief Financial Officer of Ameren Corporation from 2003 to 2009. Before joining Ameren, Mr. Baxter served as a Senior Manager at PricewaterhouseCoopers LLP (PwC).

Other public company directorships:  **Ameren Corporation** since 2014 (Executive Chairman)

Skills and qualifications:
**Chief executive experience:** Mr. Baxter's experience as a recent CEO of a Fortune 500 company provides valuable leadership insight and knowledge of strategic growth to the Board.

**Community or sustainability leadership:** Mr. Baxter's leadership relating to the environmental and sustainability strategy at a regulated electric and gas

14

utility company provides him with valuable insights and experience relating to important sustainability and environmental stewardship issues.

**Corporate governance:** Mr. Baxter has gained significant corporate governance expertise through his service as the Executive Chairman and Chairman of a large public company, as well as through his current leadership of the Audit Committee.

**Financial reporting and accounting:** Through his past experience as the CFO and Controller of a large publicly traded company and through his experience at PwC, Mr. Baxter brings extensive financial reporting and accounting expertise to our Board.

**Other regulated industry expertise:** As the Executive Chairman and the recent President and CEO of a company in a highly regulated industry, as well as the Chairman of the industry association representing all U.S. investor-owned electric companies, Mr. Baxter provides valuable perspective on regulatory and business challenges facing our company.

**Risk management:** As the recent President and CEO of a company in a critical infrastructure industry and through his experience at PwC, Mr. Baxter brings valuable risk management expertise to our Board of Directors.

**<u>Defendant Bridges</u>**

36.     Defendant Bridges has served as a member of the USB Board since October 2018. She also serves as Chair of the Public Responsibility Committee and as a member of its Executive Committee and Risk Management Committee.

37.     For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Bridges received $283,980, $235,151, $304,500, and $304,526 in total compensation, respectively. According to the 2023 Proxy Statement, for the fiscal year 2022, Defendant Bridges's total compensation consisted of $144,500 in fees earned or paid in cash and $160,026 in stock awards.

38.     The 2023 Proxy Statement said the following about Defendant Bridges:

15

<u>Business experience:</u> Ms. Bridges, 67, is the Chief Executive Officer of the Metropolitan Economic Development Association (Meda), a nonprofit organization providing business consultancy services, access to capital and marketing opportunities to BIPOC-owned businesses. She has served in this capacity since September 2022. Ms. Bridges served as Senior Vice President of Public Affairs, Outreach and Community Development of the Federal Reserve Bank of Minneapolis, one of the twelve regional banks in the Federal Reserve System, from July 2011 until June 2018. Prior to joining the Federal Reserve Bank of Minneapolis, Ms. Bridges served as the President and Chief Executive Officer of City First Bank, a commercial bank providing financial services in low- and moderate-income communities, from 2008 until July 2011, and as President and Chief Executive Officer of Franklin National Bank, a Minneapolis commercial bank, from 1999 to 2008.

<u>Skills and qualifications:</u>
**Community or sustainability leadership:** Through her experience as the senior leader in charge of public affairs, outreach and community development, and as the CEO of a commercial bank focusing on low- and moderate-income communities, Ms. Bridges brings to our Board expertise in understanding the financial needs of the individuals living in the communities we serve.

**Financial services industry expertise:** Ms. Bridges's extensive experience in the banking industry, as a senior leader of a reserve bank and as the CEO of two commercial banks, as well as her current role as the Chair of the American Bankers Association Community Bankers' Council, gives her valuable industry and regulatory oversight expertise.

**Risk management:** Through her experience at the Federal Reserve Bank of Minneapolis, Ms. Bridges brings to our Board risk management expertise that is particularly relevant to our company.

**<u>Defendant Buse</u>**

39.    Defendant Buse has served as a member of the USB Board since June 2018. She also serves as Chair of the Capital Planning Committee and as a member of the Audit Committee.

40.    For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Buse received $287,980, $239,651, $284,000, and $285,526 in total compensation from the Company,

respectively. According to the 2023 Proxy Statement, for the fiscal year 2022, Defendant

Buse's total compensation consisted of $125,500 in fees earned or paid in cash and $160,026

in stock awards.

41.    The 2023 Proxy Statement said the following about Defendant Buse:

Business experience: Ms. Buse, 62, is the former Chief Executive Officer of
Monitise plc, a global mobile banking and payments company based in the
United Kingdom. She served as Co-Chief Executive Officer and Chief
Executive Officer of Monitise during 2014 and 2015, after retiring from Visa,
Inc., a leading payment network, as Executive Vice President of Global
Services, a position she held from 2013 to 2014. Ms. Buse held various senior
leadership positions at Visa prior to that time, including Group President for
Asia-Pacific, Central Europe, Middle East and Africa from 2010 to 2013.

Other public company directorships:
- **F5, Inc.** since 2020
- Travelport Worldwide Ltd. From 2014 to 2019

Skills and qualifications:
**Corporate governance:** Through her current and past experience as a director
for several public and private financial services technology companies,
Ms. Buse brings valuable financial services specific corporate governance best
practices experience to our Board.

**Financial services industry expertise:** As the former CEO of Monitise and
as a former senior leader at Visa, Ms. Buse gained broad financial industry
expertise that is particularly relevant to our Board.

**Risk management:** Ms. Buse brings to our Board valuable risk management
expertise gained through her work in the financial services industry.

**Defendant Ellison-Taylor**

42.    Defendant Ellison-Taylor has served as a member of the USB Board since

January 2021 and serves as a member of the Audit Committee and the Public Responsibility

Committee.

17

43.    For the fiscal years of 2021 and 2022, Defendant Ellison-Taylor received

$316,433 and $282,026 in total compensation from the Company, respectively.

44.    The 2023 Proxy Statement said the following about Defendant Ellison-

Taylor:

> <u>Business experience:</u> Ms. Ellison-Taylor, 52, is the Founder and Chief
> Executive Officer of KET Solutions, LLC, a consulting firm focused on
> business growth, innovation, strategy, transformation and inclusive leadership.
> She has served in this capacity since April 2021. Ms. Ellison-Taylor served as
> the Executive Director of Finance Thought Leadership of Oracle Corporation,
> a Fortune 100 company that provides products and services for enterprise
> information technology environments, from April 2019 to April 2021.
> Ms. Ellison-Taylor served as the Global Strategy Leader in the Cloud Business
> Group of Oracle from September 2018 to March 2019 and as the Global
> Strategy Director in the Financial Services Industry Group of Oracle from
> July 2015 until September 2018, where she led worldwide teams to develop
> and execute strategies dealing with cloud data, information security, fraud
> prevention and detection, and customer experience. From 2016 to 2018, she
> also served as the chairman of the American Institute of CPAs, the world's
> largest member association representing the accounting profession. Prior to
> joining Oracle in 2004, she held roles at NASA's Goddard Space Flight
> Center, Motorola and KPMG and served as the Chief Information Technology
> Officer for Prince George's County Government in Maryland.
>
> <u>Other public company directorships:</u> **EverCommerce Inc.** since 2021 (Audit
> Committee)
>
> <u>Skills and qualifications:</u>
>
> **Community or sustainability leadership:** Ms. Ellison-Taylor brings to our
> Board current expertise in overseeing climate risk and creating sustainable
> growth strategies, gained through her certification in the Diligent Climate
> Leadership Program.
>
> **Customer experience:** Ms. Ellison-Taylor brings to our Board expertise
> relating to customer opportunities and expectations, gained through her prior
> experience as the senior leader of a consumer-focused company.
>
> **Digital, technology, or cybersecurity experience:** Through her past
> experiences at a company providing innovative technology products and

services, her experience as a Chief Information Technology Officer, her current roles consulting on innovation and transformation and teaching Emerging Technologies and Innovation at Carnegie Mellon University, Ms. Ellison-Taylor brings to our Board vast expertise of innovative technology that is particularly relevant to our company.

**Financial reporting and accounting:** Ms. Ellison-Taylor's experience as a CPA and former chairman of the American Institute of CPAs provides valuable financial reporting and accounting expertise to our Board.

### **Defendant Harris**

45.    Defendant Harris has served as a member of the USB Board since October 2014 and serves as Chair of the Governance Committee and as a member of the Compensation and Human Resources Committee and Executive Committee.

46.    For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Harris received $286,480, $237,651, $289,500, and $289,526 in total compensation, respectively. According to the 2023 Proxy Statement, for fiscal year 2022, Defendant Harris's total compensation consisted of $129,500 in fees earned or paid in cash and $160,026 in stock awards.

47.    The 2023 Proxy Statement said the following about Defendant Harris:

Business experience: Ms. Harris, 58, is the retired President and Chief Executive Officer of Puget Energy, Inc., an energy services holding company, and its subsidiary Puget Sound Energy, Inc., a utility company providing electric and natural gas service in the northwest United States. She served in these positions from March 2011 until her retirement in January 2020. Ms. Harris served as President of Puget Energy and Puget Sound Energy from July 2010 through February 2011 and as Executive Vice President and Chief Resource Officer from May 2007 until July 2010. Prior to joining Puget Energy, Ms. Harris practiced law at Perkins Coie.

Other public company directorships:
- **American Water Works Company, Inc.** since 2019 (Governance and Nominations Chair, Executive Development and Compensation, and Safety, Environmental, Technology and Operations Committees)
- Puget Energy, Inc. and Puget Sound Energy, Inc. from 2011 to 2020

19

Skills and qualifications:

**Chief executive experience:** Ms. Harris's experience as a CEO provides valuable leadership and executive management perspective to our Board gained by leading a large company through challenging economic and regulatory environments.

**Community or sustainability leadership:** Ms. Harris's experience as CEO and former chief resource officer of an energy services holding company provides her with important perspectives on environmental sustainability and related risk matters.

**Other regulated industry expertise:** Ms. Harris's experience as the leader of a company in a heavily regulated industry gives her valuable expertise in managing a complex business in the context of an extensive regulatory regime.

**Risk management:** As the recently retired President and CEO and current Board member of companies in critical infrastructure industries, Ms. Harris brings valuable risk management experience and perspectives to our Board.

## **Defendant Hernandez**

48.     Defendant Hernandez has served as a member of the USB Board since January 2012. Defendant Hernandez also serves as a member of the Executive Committee, Governance Committee, and Compensation and Human Resources Committee.

49.     For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Hernandez received $304,480, $251,151, $289,500, and $289,526 in total compensation, respectively. According to the 2023 Proxy Statement, for the fiscal year 2022, Defendant Hernandez's total compensation consisted of $129,500 in fees earned or paid in cash and $160,026 in stock awards.

50.     The 2023 Proxy Statement said the following about Defendant Hernandez:

Business experience: Mr. Hernandez, 65, is the Founding Principal and Chief Executive Officer of Hernandez Media Ventures, a privately held company engaged in the acquisition and management of media assets. He has served in

this capacity since January 2001. Mr. Hernandez served as Chairman of Telemundo Group, Inc., a Spanish-language television and entertainment company, from 1998 to 2000 and as President and Chief Executive Officer from 1995 to 2000. He previously served on the Board of Directors of The Ryland Group, Inc., Sony Corporation, and Walmart Inc.

Other public company directorships:

- **Fox Corporation** since 2019 (Audit Committee Chair; Nominating and Corporate Governance Committee)
- **Take-Two Interactive Software, Inc.** since 2019 (Compensation Committee)
- Belmond Ltd. (formerly Orient Express Hotels Ltd.) from 2013 to 2019
- Vail Resorts, Inc. from 2002 to 2019
- MGM Resorts International from 2002 to 2021

Skills and qualifications:

**Chief executive experience**: Mr. Hernandez's experience as a former CEO of Telemundo provides valuable leadership insight and operational and strategic knowledge to the Board.

**Corporate governance:** Through his past experience as the Chairman or Lead Director of several public companies, Mr. Hernandez brings to our Board significant expertise in corporate governance issues and best practices.

**Customer experience:** Mr. Hernandez brings deep expertise of customer expectations to our Board and adds a perspective on customer opportunities, gained through his prior experience as the leader of a consumer-focused company and through his service on the boards of directors of numerous customer focused companies.

**Financial reporting and accounting:** With his extensive past and current experience on the audit committees of the boards of public companies, Mr. Hernandez brings broad financial reporting and accounting expertise to our Board.

**Defendant McKenney**

51.    Defendant McKenney has served as a member of the USB Board since October 2017. Defendant McKenney also serves as a member of the Executive Committee, Governance Committee, and Risk Management Committee.

52.    For the fiscal years of 2019, 2020, 2021, and 2022, Defendant McKenney received $315,480, $260,151, $320,500, and $312,526 in total compensation from the Company, respectively. According to the 2023 Proxy Statement, for fiscal year 2022, Defendant McKenney's total compensation consisted of $147,500 in fees earned or paid in cash and $160,026 in stock awards.

53.    The 2023 Proxy Statement said the following about Defendant McKenney:

Business experience: Mr. McKenney, 54, is the President and Chief Executive Officer of Unum Group, a workplace financial protection benefits company. He has served as President since April 2015 and as Chief Executive Officer since May 2015. Mr. McKenney served as Executive Vice President and Chief Financial Officer of Unum from 2009 to 2015. Prior to joining Unum in 2009, he served as Executive Vice President and Chief Financial Officer at Sun Life Financial, Inc., an international financial services company, from 2006 to 2009. Mr. McKenney began his career at General Electric Company, transitioning his roles from manufacturing to financial leadership.

Other public company directorships: **Unum Group** since 2015

Skills and qualifications:

**Chief executive experience:** Mr. McKenney's experience as a current CEO provides valuable strategic and operational expertise to our Board gained by leading a large company through the current economic and regulatory environment.

**Corporate governance:** As the current President, CEO and board member of a public company, Mr. McKenney has gained significant corporate governance expertise that is valuable to our Board.

**Financial reporting and accounting:** Through his past experience as CFO of several companies, Mr. McKenney brings extensive financial reporting and accounting expertise to our Board.

**Financial services industry expertise:** As the current President and CEO of a financial services company, Mr. McKenney brings to our Board discussions expertise in managing the business environment facing financial services companies and important perspective regarding the regulatory environment for financial services companies.

22

**Risk management:** Through his experience as the leader of a financial services company, Mr. McKenney brings experience identifying, assessing and managing risk exposures of large, complex financial firms.

**Defendant Mehdi**

54.     Defendant Mehdi has served as a member of the USB Board since June 2018. Defendant Mehdi also serves as a member of the Public Responsibility Committee and Risk Management Committee.

55.     For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Mehdi received $283,980, $232,151, $299,500, and $299,526 in total compensation from the Company, respectively. According to the 2023 Proxy Statement, for the fiscal year 2022, Defendant Mehdi's total compensation consisted of $139,500 in fees earned or paid in cash and $160,026 in stock awards.

56.     The 2023 Proxy Statement said the following about Defendant Mehdi:

Business experience: Mr. Mehdi, 56, is the Corporate Vice President of the Modern Life and Devices Group of Microsoft Corporation, a multinational technology company. The Modern Life and Devices Group operates the Windows, Surface, Office, and Bing businesses of Microsoft. He has served in this position since June 2018. From 2015 to June 2018, he served as Corporate Vice President of the Windows and Devices Group and from 2011 to 2015 as the Corporate Vice President and Chief Marketing and Strategy Officer of the Interactive Entertainment Division, which operated Microsoft's Xbox business. Mr. Mehdi joined Microsoft in 1992 and held various leadership positions within the company prior to being named Senior Vice President of Microsoft's Online Services Division in 2001.

Skills and qualifications:
- **Customer experience:** Mr. Mehdi's role driving customer experience at a large multinational company brings valuable retail and online business expertise to our Board, as well as adds a perspective on public and social policy issues facing a large consumer retail business.
- **Digital, technology, or cybersecurity experience:** Mr. Mehdi's significant experience in an industry that must adapt in real time to rapid changes in

23

technology and customer expectations is a valuable resource in executing the company's corporate strategy.

**Defendant Wiehoff**

57.     Defendant Wiehoff has served as a member of the USB Board since January 2020. Defendant Wiehoff also serves as a member of the Capital Planning Committee and Risk Management Committee.

58.     For the fiscal years of 2020, 2021, and 2022, Defendant Wiehoff received $317,827, $279,500, and $281,026 in total compensation from the Company, respectively. According to the 2023 Proxy Statement, for fiscal year 2022, Defendant Wiehoff's total compensation consisted of $121,000 in fees earned or paid in cash and $160,026 in stock awards.

59.     The 2023 Proxy Statement said the following about Defendant Wiehoff:

Business Experience: Mr. Wiehoff, 61, is the retired Chairman and Chief Executive Officer of C.H. Robinson Worldwide, Inc., a multimodal transportation services and third-party logistics company. He served as Chairman from 2006 to 2020. He also served as President from 1999 to 2019 and as Chief Executive Officer from 2002 to 2019. Prior to 1999, Mr. Wiehoff served in various senior leadership roles at C.H. Robinson starting in 1992 and began his career at Andersen Worldwide LLP with several different positions, including audit manager.
Other public company directorships:
- **Polaris Industries, Inc.** since 2007 (Chairman; Corporate Governance and Nominating Committee Chair; Compensation Committee)
- Donaldson Company, Inc. from 2003 to 2022
- C.H. Robinson Worldwide, Inc. from 2002 to 2020

Skills and qualifications:
**Chief executive experience:** Mr. Wiehoff's experience as the CEO of a Fortune 500 company gives him valuable leadership and business expertise, as well as extensive executive management experience.

**Corporate governance:** Mr. Wiehoff's experience as the Chairman of a public company and on the governance committees of numerous public companies provides valuable corporate governance expertise to our Board.

**Digital, technology, or cybersecurity experience:** Through his experience as the leader at a logistics company, Mr. Wiehoff provides extensive expertise to our Board in executing strategy around technological transformation.

**Financial reporting and accounting:** Mr. Wiehoff gained broad financial reporting and accounting expertise through his experience as an audit manager for a large accounting firm.

### Defendant Wine

60.    Defendant Wine has served as a member of the USB Board since July 2014. Defendant Wine also serves as a member of the Governance Committee and Executive Committee and as Chair of the Compensation and Human Resources Committee. According to the 2023 Proxy Statement, as of February 3, 2023, Defendant Wine beneficially owned 400 shares of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on February 3, 2023 was $46.69, Defendant Wine owned approximately $18,676 worth of USB stock.

61.    For the fiscal years of 2019, 2020, 2021, and 2022, Defendant Wine received $304,480, $251,151, $304,500, and $306,026 in total compensation from the Company, respectively. According to the 2023 Proxy Statement, for the fiscal year 2022, Defendant Wine's total compensation consisted of $146,000 in fees earned or paid in cash and $160,026 in stock awards.

62.    The 2023 Proxy Statement said the following about Defendant Wine:

**Business experience:** Mr. Wine, 55, is the Chief Executive Officer of CNH Industrial N.V., a global leader in capital goods including agricultural and construction equipment, trucks, and commercial vehicles. He has served in this position since January 2021. Prior to joining CNH Industrial, he served as the

25

Chairman and Chief Executive Officer of Polaris Industries Inc., a worldwide manufacturer and marketer of innovative high-performance motorized products. He served as Chairman from 2013 to 2021, and Chief Executive Officer from 2008 to 2021. Mr. Wine began his career as an officer in the United States Navy.

**Other public company directorships:**
- **CNH Industrial N.V.** since 2021
- Polaris Industries Inc. from 2008 to 2020
- Terex Corporation from 2011 to 2020

**Skills and qualifications:**

**Chief executive experience:** Mr. Wine's experience as the CEO of a large international manufacturing company gives him broad and valuable experience in a business focused on growing operations within domestic and overseas markets.

**Corporate governance:** Through his prior experience as the Chairman of a public company and his current experience as a director of a public company, Mr. Wine provides corporate governance expertise to our Board.

**Customer experience:** Mr. Wine contributes to our Board a current perspective on consumer expectations and retail business gained from his leadership of a consumer-focused company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

63.    By reason of their positions as officers, directors, and/or fiduciaries of USB and because of their ability to control the business and corporate affairs of USB, the Individual Defendants owed USB and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage USB in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of USB and its shareholders so as to benefit all shareholders equally.

26

64.    Each director and officer of the Company owes to USB and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of USB, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

66.    To discharge their duties, the officers and directors of USB were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

67.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of USB, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of USB's Board at all relevant times.

68.     As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

69.     To discharge their duties, the officers and directors of USB were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of USB were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to USB's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;©)     remain

informed as to how USB conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of USB and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that USB's operations would comply with all applicable laws and USB's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.    Each of the Individual Defendants further owed to USB and the shareholders the duty of loyalty requiring that each favor USB's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

71.    At all times relevant hereto, the Individual Defendants were the agents of each other and of USB and were at all times acting within the course and scope of such agency.

72.    Because of their advisory, executive, managerial, directorial, and controlling positions with USB, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

73.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by USB.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

74.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

75.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial

condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

76.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of USB was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

77.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

78.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of USB and was at all times acting within the course and scope of such agency.

## **CODE OF ETHICS**

79.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

80.     The Code of Ethics provides, as to "Your Responsibilities," that officers, directors, and employees of USB are accountable for:

Understanding and complying with our Code of Ethics and Business Conduct.

Following the letter and spirit of all laws and regulations and all company policies and procedures.

Treating employees, customers and business partners with respect. •   Being clear, truthful, fair, transparent, responsible and accurate with all stakeholders, including customers, regulators, third parties, shareholders, internal and external auditors, the board of directors and other employees.

Providing prompt, complete and accurate information to banking regulators and auditors according to applicable regulations, policies and procedures, and cooperating fully with banking regulators and auditors.

Helping our customers avoid harm. This includes protecting their information and privacy and protecting them from unlawful discrimination and unfair, deceptive or abusive acts or practices.

Protecting our reputation as a safe and trusted financial institution.

Speaking up to report concerns and violations using the resources on page 6. This includes potential violations or significant compliance failures as described in the U.S. Bancorp Enterprise Compliance Program Policy. It also includes reporting suspected or actual violations of audit or internal control matters and disclosure obligations, as described in the U.S. Bancorp Unethical Conduct Escalation, Investigation and Reporting Policy.

Cooperating with investigations, providing complete and truthful information.

Completing required and/or assigned training and associated certifications (for example, ethics and compliance training, among other topics) successfully and on time.

81.    The Code of Ethics provides, as to "Respecting our customers," that "[w]e treat our customers professionally and with respect, and we put their best interest at the center of everything we do."

82.    The Code of Ethics provides, as to "Fair and responsible banking laws," that:

We do business in a fair and responsible manner, and we expect the same from our business partners. This commitment guides the ways we offer financial products and services and conduct activities throughout the entire customer relationship and product lifecycle. This enables us to:

Prevent unlawful discriminatory practices.

Prevent harm to our customers.

Avoid unfair, deceptive or abusive acts or practices (collectively called "UDAAP").

Ensure compliance with all applicable fair lending and responsible banking laws and regulations.

83.    The Code of Ethics provides, as to "Responsible marketing, sales and servicing activities," that:

We're proud to offer our customers the best products and services available to meet their diverse needs. We design fair and responsible products and services, and we market and advertise them in a fair and responsible way. We inform customers and potential customers about product and service options and we explain terms and features to help customers make informed decisions.

We also provide service in a fair, responsible and consistent manner. We listen to customer feedback and monitor our servicing efforts, which include: handling inquiries and customer complaints; ensuring timely and accurate transaction, payment and data processing; and managing fee practices, collection activities, account resolution and property disposition.

When we have an experience that doesn't meet our standards, may not comply with the letter or spirit of the law or may create undue risk for our customers, we act promptly to do the right thing.

Sales always must be based on customer needs or requests—they should never be the result of pressuring customers into opening products or services to meet incentive, sales or recognition goals.

84.     The Code of Ethics provides, as to "Sales practices," that:

Internal gaming and aggressive, deceptive, unfair or abusive sales practices are prohibited. You may not manipulate records, open bogus accounts, sell products and/ or open accounts without a customer's affirmative consent, falsify applications or skew results in any way for the benefit of yourself or other employees. Third parties also are prohibited from doing this in support of the company, our customers or potential customers.

85.     The Code of Ethics provides, as to "Records and filings," that:

As a U.S. publicly traded company, national bank and global financial institution, we make filings with many government agencies, including the U.S. Securities and Exchange Commission (SEC), the U.S. Federal Reserve, the U.S. Office of the Comptroller of the Currency (OCC), the Central Bank of Ireland (CBOI), the Canadian Office of the Superintendent of Financial Institutions (OSFI) and other global financial regulators. Our disclosures must be full, fair, accurate, timely and understandable. We have strict disclosure controls and procedures and stringent internal controls over financial reporting. If you're involved in preparing our public disclosures, you have a special responsibility to help us meet these standards. Each one of us is responsible for ensuring the information we record, process and analyze is:

- Complete, accurate and recorded in a timely manner.
- Handled according to applicable accounting standards, legal requirements and internal controls.
- Corrected immediately if errors occur.

This information includes accounting and audit records, loan documents, phone records, transaction records, ATM and teller balancing, expense reports and all other records that are part of our day-to-day business. You also must follow  notary requirements.

86.     The Code of Ethics provides, as to "Reporting concerns," that:

You have the right—and the obligation—to report possible violations of accounting, audit or internal control matters, disclosure obligations, laws and company policies without fear of discrimination, retaliation, threats or harassment. Use the resources on page 6. Complaints alleging accounting matters, securities or commodities trading law violations or violations of our

Anti-bribery and Anti-corruption Policy should be reported to the Global Ethics Office immediately.

87.     The Code of Ethics provides, as to "Record retention and legal hold policies," that:

> We maintain certain records to meet legal, tax and regulatory requirements. You're responsible for retaining records as described by our corporate record retention schedule, understanding and complying with our Legal Records Hold policy and completing training on this topic as required.

88.     In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to engage in the Account Misconduct and the Consumer Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and aiding and abetting thereof.  In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, avoid insider trading, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

## AUDIT COMMITTEE CHARTER

89.     According to the Company's Audit Committee Charter, the purpose of the Audit Committee is:

> The Audit Committee (the "Committee") of U.S. Bancorp (the "Parent") and U.S. Bank National Association (the "Bank," and together with the Parent, the "Company") is a committee of both boards of directors (collectively, the "Board" or the "Board of Directors"). The purpose of the Committee is to

provide assistance to the Board of Directors in fulfilling its responsibility to the shareholders, potential shareholders, investment community and bank regulatory agencies with respect to its oversight of: (i) The quality and integrity of the Company's financial statements and the adequacy and reliability of disclosures to shareholders and bank regulatory agencies, including matters relating to its accounting, financial reporting, and internal controls; (ii) The Company's compliance with legal and regulatory requirements; (iii) The independent registered public accounting firm's ("independent auditor's") qualifications and independence; and (iv) The activities and performance of the Company's internal audit function and independent auditors. In addition, the Committee (i) reviews and approves the report that Securities and Exchange Commission ("SEC") rules require be included in the Parent's annual proxy statement, (ii) performs the audit committee functions specified by 12 C.F.R. Part 363 for the Bank and any other depository institution subsidiary of the Company that does not have its own audit committee, and (iii) performs the functions of a fiduciary audit or similar committee for any subsidiary of the Company exercising fiduciary powers that does not have its own audit committee, including serving as the fiduciary audit committee required by 12 C.F.R. § 9.9 for the Bank, in each case to the extent permitted, and in the manner required, by applicable laws and regulations.

90.     Regarding "Documents/Reports Review," the Audit Committee Charter stated the following:

> 1. Review and discuss with management and the independent auditors, prior to public dissemination, the Parent's annual audited financial statements and quarterly financial statements, including the Parent's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and discuss with the independent auditors the matters required to be discussed by Public Company Accounting Oversight Board Auditing Standard "Communication with Audit Committees" and other professional auditing standards, and recommend to the Board whether the audited financial statements should be included in the Parent's Form 10-K. 2. Review and discuss with management and the independent auditors the financial results communicated in the Parent's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information), as well as any other financial information and earnings guidance provided to analysts and rating agencies. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), and each earnings release or instance in which the Parent provides earnings guidance need not be discussed in advance. 3. Perform any functions required to be

performed by it or otherwise appropriate under applicable law, rules or regulations, by the Company's by-laws and the resolutions or other directives of the Board, including review of any certification required to be reviewed in accordance with applicable law or regulations of the SEC; review of disclosures made to the Committee by the Parent's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data or material weaknesses in internal controls over financial reporting and any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal controls over financial reporting; and review of any changes in the Company's internal controls over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, such internal controls. 4. Review and discuss with management (including the Chief Audit Executive) and the independent auditor the Company's internal controls report and the independent auditor's attestation of the report prior to its inclusion in the filing of the Parent's Annual Report on Form 10-K.

91.     Regarding "Financial Reporting Process," the Audit Committee Charter states the following:

11. In consultation with the independent auditors, management and the internal auditors, periodically review the integrity of the Company's financial reporting processes relied upon to prepare SEC or other regulatory filings. In that review, the Committee should obtain and discuss with management and the independent auditor quarterly reports from management and the independent auditor regarding: (i) critical accounting policies and practices used by the Company; (ii) analysis prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent auditor; (iii) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (iv) significant issues relating to the adequacy of the Company's internal controls and specific audit policies or procedures adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting; and (v) any other material

written communications between the independent auditor and the Company's management, including any management letter or internal control letter and the Company's response to such letter or other disclosures as required by any applicable professional auditing standards. 12. Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company. 13. Review with the independent auditor (i) any audit problems or other difficulties encountered by the auditor in the course of the audit process, including any restrictions on the scope of the independent auditor's activities or on access to the requested information, and any significant disagreements with management and (ii) management's responses to such matters. The Committee will resolve any disagreements between management and the independent auditors regarding financial reporting and discuss with the independent auditor material issues on which the national office of the independent auditor was consulted by the team. 14. Perform the38ollea©ommittee functions specified by 12 C.F.R. Part 363 for depository institution subsidiaries of the Parent, including the Bank, and act as a fiduciary audit or similar committee for any subsidiary of the Parent exercising fiduciary powers that does not have its own audit committee, including serving as the fiduciary audit committee required by 12 C.F.R. § 9.9 for the Bank.

92.    Regarding "Legal Compliance Matters," the Audit Committee Charter states:

15. Review information from internal audit, management and the independent auditors, as appropriate, concerning the Company's compliance with applicable legal and regulatory requirements. 16. Periodically review reporting on the effectiveness of the systems that management has established to implement the'Company's ethics guidelines, including the reporting and resolution of ethics concerns, ethics education and awareness initiatives, and employees' compliance with the Company's Code of Ethics. 17. Taking into consideration the Board's assignment of primary responsibility for oversight of operational risk management to the Risk Management Committee: a) Discuss with management and the independent auditors the Company's key guidelines and policies with respect to risk assessment and risk management. Discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures. b) Review periodically, with the Company's legal counsel, any legal matter that could have a significant impact on the Company's financial statements or the effectiveness of the Company's control environment. c) Review periodically, with the Company's Chief Risk Officer, any regulatory, risk or compliance matter that could have a significant impact on the Company's financial statements or the effectiveness of the Company's control environment. d) Review significant findings with respect to the credit process arising out of credit risk management exams and the status of management's response to any

38

noted issues. 18. Review annually management's assessment of compliance with laws and regulations regarding loans to insiders (Regulation O) and dividend restrictions, and review the Company's annual FDICIA report. 19. Approve and periodically review the Company's disclosure policy for financial reporting or other required disclosures arising out of the Basel Capital Accords and other regulatory capital requirements. 20. Establish and review annually, policy and procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls or auditing matters and (ii) the confidential, anonymous submission by employees of the listed issuer of concerns regarding questionable accounting, internal controls, or auditing matters. 21. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies, and receive summaries of corrective action plans and timetables. 22. Meet with regulators when deemed necessary or appropriate by the Committee, or when requested by regulators.

93.     Regarding "Reports" and "Internal Audit," the Audit Committee Charter

states:

<u>Reports</u>

23. Prepare all reports of the Committee required to be included in the Parent's annual proxy statement, pursuant to and in accordance with applicable rules and regulations of the SEC. 24. Report regularly to the full Board of Directors on: (i) any issues that arise with respect to the quality or integrity of the Company's financial statements, application of accounting principles, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors or the performance of the internal audit function; (ii) the significant matters addressed at all meetings of the Committee, including the Committee's conclusions following its annual review of the performance of the independent auditor; and (iii) such other significant matters as are relevant to the Committee's discharge of its responsibilities. The Committee will recommend action by the Board, as the Committee deems appropriate. The report to the Board of Directors may take the form of an oral report by the Chairman or any other member of the Committee designated by the Committee to make such report. 25. Maintain minutes or other records of meetings and activities of the Committee.

<u>Internal Audit</u>

39

26. Review annually the education and experience of the key members of the internal audit team, including significant internal audit outsource vendors, and financial management personnel. 27. Review and approve the appointment and, as appropriate, the replacement of the Chief Audit Executive, after consideration of his or her skills and abilities to carry out the position's roles and responsibilities within the Company's risk governance framework. 28. Review annually and evaluate the performance of the Chief Audit Executive and report the results of this evaluation to the Chief Executive Officer, to whom the Chief Audit Executive reports administratively. 29. As part of the functional reporting relationship of the Chief Audit Executive to the Committee, review and approve the annual compensation, in form and amount, and any salary adjustment of the Chief Audit Executive. 30. Review at least annually the appropriateness of all activities assigned under the Chief Audit Executive's functional and administrative reporting responsibilities, confirming the organizational independence of the internal audit activity. 31. Review and approve, on an annual basis, the internal audit charter, riskbased audit plan (which will include the risk assessment methodology in the internal audit plan), financial budget and staffing of the internal audit activity for the upcoming year. 32. Review quarterly progress against the annual risk-based internal audit plan, and approve significant changes to the audit plan, financial budget or staffing, and actions taken or needed. 33. Make appropriate inquiries of management and the Chief Audit Executive to determine if there are inappropriate scope or resource limitations. 34. Review quarterly the internal audit activity's risk assessment of the Company and any significant changes to the risk assessment. 35. Review quarterly with management, the internal auditors and the independent auditors their assessments of the adequacy of internal controls and the status of resolution of any identified material weaknesses or reportable conditions. 36. Review at least annually key internal audit policies. 37. Review reports on significant changes in staffing, processes, and industry trends as needed, and review results of the external quality assessment review required by the Institute of Internal Auditors every five years. 38. Review at least annually the results of the Quality Assurance and Improvement Program, including Internal Audit's: a) Self-assessment against internal audit international standards b) Self-assessment against applicable laws and regulations c) External assessments of the internal audit function

94.    In violation of the Audit Committee Charter, the Individual Defendants serving on the Audit Committee throughout the Relevant Period failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions, including as each related to the Account

Misconduct and the Consumer Misconduct; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background of the Company

95.    USB is a Delaware company founded in 1863 and headquartered in Minneapolis, Minnesota. The Company offers a wide range of financial services like lending and depository services, cash management, and capital markets. USB also provides credit card services, merchant and ATM processing, mortgage banking, insurance, brokerage, and leasing. The Company has a banking subsidiary, U.S. Bank, which engages in general banking operations. The Company is the publicly traded parent company of U.S. Bank.

### The Account Misconduct

**A. The CFPB Issues a Consent Order Detailing Unlawful Practices at the Company and Defendants' Knowledge Regarding the Same**

96.    On July 28, 2022, the CFPB renounced the Bank's continued proclamation of ethicality, trustworthiness, and "best-in-class . . . risk management" systems, through the issuance of a Consent Order wherein the CFPB fined the bank $37.5 million for "***Illegally Exploiting*** Personal Data to Open Sham Accounts for Unsuspecting Customers." That day, the CFPB represented in a press release that U.S. Bank "illegally access[ed] its customers' credit reports and open[ed] checking and savings accounts, credit cards, and lines of credit without customers' permission." Moreover, the press release stated:

> U.S. Bank pressured and incentivized its employees to sell multiple products and services to its customers, including imposing sales goals as part of their

employees' job requirements. In response, U.S. Bank employees unlawfully accessed customers' credit reports and sensitive personal data to apply for and open unauthorized accounts. U.S. Bank must make harmed customers whole and pay a $37.5 million penalty.

97.     CFPB Director, Rohit Chopra, also explained that "'[f]or over a decade, U.S. Bank knew its employees were taking advantage of its customers by misappropriating consumer data to create fictitious accounts.'" The CFPB further explained the results of its investigation as follows:

> The CFPB's investigation found *specific evidence* that revealed that U.S. Bank was *aware* that sales pressure was leading employees to open accounts without authorization, and the bank had inadequate procedures to prevent and detect these accounts. Specifically, U.S. Bank imposed sales goals on bank employees as part of their job requirements. U.S. Bank also implemented sales campaigns and an incentive-compensation program that financially rewarded employees for selling bank products.
>
> U.S. Bank's conduct harmed its customers in the form of unwanted accounts, negative effects on their credit profiles, and the loss of control over personally identifiable information. Customers also had to waste time and energy closing unauthorized accounts and resolving consequences stemming from them, including seeking refunds for improperly charged fees.
>
> The CFPB found that U.S. Bank violated the Consumer Financial Protection Act, the Fair Credit Reporting Act, the Truth in Lending Act, and the Truth in Savings Act. Specifically, U.S. Bank was:
>
> • **Exploiting personal data without authorization**: The Fair Credit Reporting Act, among other things, defines the permissible uses of credit reports, and users of credit reports may only request them if they have a permissible purpose. U.S. Bank used customers' credit reports without a permissible purpose, and without its customers' permission, to facilitate opening unauthorized credit cards and lines of credit.
> • **Opening accounts without consumer permission**: U.S. Bank opened deposit accounts, credit cards, and lines of credit without permission. This included opening Reserve and Premier lines of credit, which carry high interest rates and expensive fees. This behavior violated the Consumer Financial Protection Act and the Truth in Lending Act.
> • **Failing to provide legally required consumer disclosures**: The Truth in Savings Act requires banks to provide certain disclosures when opening new

deposit accounts. U.S. Bank violated the law when its employees opened consumer deposit accounts without permission and, in the process of doing so, failed to provide the required disclosures.

98.     The Consent Order noted that U.S. Bank "imposed sales goals on bank employees as a factor in evaluating employee performance and implemented an incentive-compensation program that financially rewarded employees for selling" the Company's services and products. According to the Consent Order, the sales goals were implemented in order to increase sales of consumer financial products or services and "included a point-based system, with different point values assigned to different products . . . primarily based on the revenue that each product generated for the bank." Employees at USB were pressured "to sell more products" because, according to the Consent Order, doing so was in U.S. Bank's interest – in particular, increasing sales and related revenue associated with increased sales. Indeed, in "response to sales pressure or to obtain incentive awards," USB employees opened accounts, submitted applications for and issued credits cards and opened lines of credit linked to deposit accounts "*without consumers' knowledge and consent*." Moreover, the Consent Order found that these unlawful practices had "generated associated fees from products opened without consumers' knowledge and consent."

99.     Most importantly, the Consent Order emphasized that from January 1, 2010 through December 31, 2020 (the "Findings Period"), the processes utilized by U.S. Bank "were not reasonably designed to determine the full scope of Improper Sales Acts or Practices." This is largely due to the fact that, before 2016, U.S. Bank "primarily relied on consumers to self-identify or on consumers or employees to allege improper activity." The Consent Order further noted that U.S. Bank "*[o]nly recorded or investigated the allegations*

43

*if the allegation was escalated above the bank-branch level,"* and *"was aware that many allegations were not escalated or recorded*." That is to say, the Bank did not investigate or track instances of unauthorized accounts opened at all, since it failed to maintain a system of controls designed to detect improper sales activity until, at the earliest, 2016, when U.S. Bank first "began enhancing its processes for detecting and investigating sales misconduct."

100.    The unlawful and improper sales activities at U.S. Bank injured consumers through "fees charged on unauthorized accounts; negative impacts to consumer credit profiles; the loss of control over personal identifying information; and the expenditure of consumer time and effort investigating the facts, seeking closure of unwanted accounts, and monitoring and mitigating harm going forward." The Consent Order required U.S. Bank to: (1) pay a $37.5 million penalty to the CFPB to be deposited into a victims relief fund to compensate those consumers harmed by violations of federal consumer financial protection law; (2) forfeit and return all unlawfully charged fees and costs to injured customers; and (3) create and develop a plan to remediate harmed consumers by returning to consumers all charged fees and costs obtained unlawfully, plus interest.

### B.  Defendants Knew that USB's Business Conduct Was Illegal After the Truth Was Revealed Regarding the Wells Fargo Fake Accounts Scandal

101.    The CFPB investigation into USB's unauthorized accounts occurred during the same time period as the sham accounts scandal that engulfed Wells Fargo. In particular, Wells Fargo employees were found to be opening unauthorized accounts on behalf of customers, which resulted in a host of issues for the company, including a myriad of lawsuits, settlements, and fines. Indeed, Arthur Levitt, former SEC Chairman, characterized the Wells Fargo investigation as a "scandal of almost unimaginable proportions." Given that USB had

44

used a similar unauthorized-accounts scheme to illegally artificially inflate consumer sales and engagement for years and that Wells Fargo was in severe legal and regulatory peril as the target of a sweeping CFPB investigation, the Wells Fargo scandal should have been a key focus for Defendants when they made their misleading statements and omissions during the Relevant Period.

102.    On September 8, 2016, the CFPB published a Consent Order and enforcement action against Wells Fargo, therein punishing Wells Fargo for its "***illegal*** practice of secretly opening unauthorized deposit and credit card accounts." The CFPB's announcement of the enforcement action mentioned that the underlying facts were known by Wells Fargo prior to the CFPB investigation and that an internal investigation at Wells Fargo had revealed deceptive and fraudulent practices. In particular, the CFPB found that Wells Fargo had: (1) opened unauthorized deposit accounts for existing customers and transferred funds to those accounts without the customers' consent or knowledge; (2) submitted applications for credit cards in customers' names without the customers' consent or knowledge; (3) enrolled and registered customers in online banking services they did not request; and (4) ordered and activated debit cards using customers' information without their consent or knowledge.

103.    The CFPB's announcement further reported that Wells Fargo had "compensation incentive programs for its employees that encouraged them to sign up existing clients for deposit accounts, credit cards, debit cards, and online banking," and that "Wells Fargo employees illegally enrolled consumers in these products and services without their knowledge or consent in order to obtain financial compensation for meeting sales targets."

Richard Cordray, the then CFPB Director, stated, "'Today's action should serve notice to the entire industry that financial incentive programs, if not monitored carefully, carry serious risks that can have serious legal consequences.'" This "notice" was directed at Defendants Cecere, Dolan, Quinn and Richard, among other banking executives, as they were all senior executives in the banking industry.

104.    On the news of the CFPB Consent Order and enforcement action, the price of Wells Fargo stock dropped $1.18 per share on Friday, September 9, 2016, from closing at a price of $49.90 per share to close at $48.72 per share, and then continued dropping the following week. This further evidences the material risk posed by such unlawful business practices to financial institutions like the Company.

105.    After the filing of the CFPB action,  a *Reuters* article published on September 16, 2016 stated that, "A phantom account scandal at Wells Fargo & Co. has put the U.S. bank's disclosure policies under a harsh spotlight." Under the heading "Material Or Not?" the *Reuters* article stated that, "The tactics deployed in its branches were not a surprise for Wells." Indeed, Wells Fargo had been looking into them since 2011, but "[n]o mention is made of the bank's internal probe, or authorities' probes in the 'legal actions' section of [Wells Fargo's] latest quarterly or annual securities filings. . . . ***Experts said Wells Fargo would have been wise to at least flag the issue earlier***."

106.    Later in September 2016, Wells Fargo's CEO and Chairman, John Stumpf ("Stumpf"), testified under oath before the Senate Banking Committee, where he admitted that he and other bank executives had known of unethical practices in the retail banking segment of Wells Fargo for years prior to September 2016, in addition to regulatory

investigations into those unethical practices. However, Stumpf attempted to downplay the sham accounts scandal, representing that it "was not a material event" and that the bank just "had some indication that we had one percent of our people who were doing the wrong thing." However, in response to Pennsylvania Senator Pat Toomey's question, "When did you begin to disclose in SEC filings that you had this potentially material adverse set of circumstances that could certainly have huge damage to your reputational value?," Stumpf replied, "I do not know." Senator Toomey then stated: "Well, we haven't been able to discover a disclosure, and the SEC very clearly requires disclosure of material adverse circumstances. And I do not know how this could not be deemed 'material' . . . the reputational damage done to the bank is clearly material."

107.    Stumpf resigned as CEO and Chairman of Wells Fargo two weeks after his Congressional testimony and revealed that he would have to forfeit $41 million in previously awarded compensation. Later, in January 2020, the OCC announced that Stumpf would have to pay $17.5 million for his participation and role in the sham accounts scandal and would be banned from ever working at a bank again. In consequence, Wells Fargo paid billions in fines to numerous state and federal agencies, including the CFPB, the SEC, the Department of Justice, the U.S. Attorney's Offices for the Central District of California and the Western District of North Carolina and the city and county of Los Angeles. Wells Fargo also paid hundreds of millions of dollars to shareholders and account holders to resolve actions brought in connection with the scheme.

   **C. Defendant Cecere Faces Pressure to Improve USB's Growth Results and Cement its Industry- Leading Brand and Reputation Amidst the Wells Fargo Scandal**

108.    A February 21, 2017 exposé in *American Banker* discussed the approaching transition from USB's then-Chairman and CEO Richard Davis to Defendant Cecere, who was set to take over as head of USB in April 2017. In the report, a senior research analyst with Sanford C. Berstein commented, "'I can't imagine a more seamless transition'" given that "the two walk in lockstep on strategy and direction" and that "'Wall Street looks at them very much as a pair.'" Regarding Defendant Cecere's upcoming challenges, the author stated that USB's "biggest issue . . . by all accounts" is growth-related as the Company had "fallen short of expectations" and failed to "meet its three-year growth targets set in 2013." As a result, Defendant Cecere was poised to enter as CEO "under pressure to deliver better results."

109.    The *American Banker* exposé also discussed USB's "scandal-free" reputation, quoting CEO Davis in this context who stated, "'we walk a tightrope that's higher than any other bank, and we have no net . . . If we screw up, we're in trouble.'" The author discussed that such efforts made USB a constant on a list of the 'world's most ethical companies' published by Ethisphere. Defendant Quinn also commented in the exposé on the Company's "different and unique culture," noting that two of the Company's "five core values" included that "'We do the right thing'" and "'We put people first.'" Defendant Quinn also explained that USB's "three main business goals are embodied in the culture," including "to be customers' most trusted choice." Amidst this context, the author concluded that, upon Defendant Cecere's elevation to CEO, "[m]aintaining USB's credibility will likely make [him] a success. Boosting revenue and the bottom line could make him a star[.]"

### D. USB CEO Admits Responsibility but Misleadingly Attempts to Downplay Its Significance, In Response to Congress's Probe of USB's Unlawful Conduct

110.    On August 4, 2022, the Senate Banking Committee sent a letter to Defendant Cecere about the Company's "concerning" misconduct coming on the heels of a similar fake accounts scandal plaguing Wells Fargo. The Senate Banking Committee noted the CFPB's findings that U.S. Bank used an incentive compensation program to incentivize employees to "engage[] in unlawful activity by utilizing customers' personal identifying information to open deposit accounts, apply for and issue credit cards, and open lines of credit," which "accrued fees and increased profits" and which the CFPB found "violated federal consumer laws and violated individual consumers' control over their data privacy." The Senate Banking Committee asked the Company for detailed information regarding the misconduct and indicated that it would further scrutinize Defendant Cecere at the Annual Wall Street Oversight Hearing in September 2022.

111.    At the hearing, Defendant Cecere **_admitted_** to the dishonorable and unlawful conduct of USB and its employees, stating: "**_I take full responsibility that we did open up unauthorized bank accounts. It was going back to 2010._** It's unacceptable. It's inconsistent with our principles and procedures as well as our ethics."[3] Defendant Cecere attempted to downplay the impact of the misconduct and his disclosure by claiming that the Company only "identified 342 accounts over that time . . . against a population of 40 million opened accounts." However, Defendant Cecere's testimony failed to provide any evidence or context for his improbable assertion and grossly misrepresented the extent of unauthorized accounts at the Bank.

---

[3] Any emphasis throughout this complaint has been added unless otherwise noted herein.

112.     As explained above, the Consent Order specified that ***throughout*** the 11-year Findings Period, USB's processes "were not reasonably designed to determine the full scope" of the misconduct. Moreover, for the first six years of the Findings Period – until 2016 – the Company failed to put in place ***any*** system for identifying unauthorized accounts as it relied on either: (i) consumers to self-identify improper conduct or (ii) consumers or employees to allege improper activity. Nevertheless, even when consumers or employees identified misconduct, USB "only recorded or investigated the allegations if the allegation was escalated ***above*** the bank-branch level," and according to the Consent Order, USB "was ***aware*** that many allegations were not escalated or recorded." Therefore, while Defendant Cecere's testimony claimed that unauthorized accounts were hardly a problem at USB, it also concealed the true magnitude of unauthorized accounts affected by the Bank's misconduct, which continued for years after the CFPB launched its investigation.

### The Consumer Misconduct

113.     On December 19, 2023, the CFPB issued a press release announcing that the "(CFPB) today ordered U.S. Bank to pay ***nearly $21 million for keeping out-of-work consumers from accessing unemployment benefits*** at the height of the COVID-19 pandemic." The press release further revealed that U.S. Bank "froze tens of thousands of accounts" but "failed to provide people a reliable and quick way to regain access." The CFPB's order required U.S. Bank to pay $5.7 million to consumers and a $15 million penalty to the CFPB.

114.     Separately, the OCC fined U.S. Bank $15 million for the aforementioned misconduct, after the CFPB and OCC coordinated to investigate U.S. Bank's illegal conduct.

**False and Misleading Statements**

***Misleading Statements and Material Omissions Regarding USB's Trust, Ethics, and Brand***

***September 12, 2019, Investor Day Conference***

115.     On September 12, 2019, USB filed a Current Report on Form 8-K with the SEC, which attached as an exhibit presentation slides entitled "USB Investor Day" for USB's Investor Day held that same day. Defendants Cecere, Dolan, and Quinn, along with other members of USB's executive management team, presented during the Investor Day conference.

116.     The presentation included the following slide, which Defendant Cecere presented in a "Strategic Overview," entitled "Our Advantages," in which the Company emphasized its "***strong reputation rooted in trust and engagement***," as depicted in the following slide:

**Our Advantages**









**Best-in-class financial results and risk management.** Track record of industry leading performance and the highest debt ratings in the world.

**A diverse mix of businesses and core financial products.** Balance of customers and fee and non-fee based businesses.

**A strong reputation rooted in trust and engagement.** Recognized inside and outside the bank for focus and action in areas that matter most.

**A clear strategy that we are executing effectively.** Nimble yet clear so we can evolve in a rapidly changing environment.



U.S. BANCORP | 53

117.    Moreover, Defendant Cecere presented a slide to investors where he explained "[w]e will keep what made us great," including "[o]r culture," and further noted that "[c]ustomers and employees remain at the center of everything we do – past, present and future," as depicted in the following slide:



118.    Defendant Cecere also touted in slides during his presentation that "We Are Enhancing Our Capabilities to Compete in a New World," including by "[f]ocusing relentlessly on the customer," and that the Company was "Positioned to Win" because the Bank's "reputation" is a "differentiator[]."

119.    USB's Chief Administrative Officer, Defendant Quinn, presented on the Company's "Brand and Culture," which she characterized as a "Source of **Competitive Advantage**," and which included the terms "ethics," "trust," "respect," "customer transparency," "caring" and "honesty," among other things, as depicted in the following slide:



120.    Defendant Quinn also represented that "Brand Directly Impacts Every Major Constituency" and specifically identified employees, customers, communities and shareholders as the aforementioned "Major Constituencies" as depicted in the following slide:







121.    Defendant Quinn touted in another slide the Company's "Strong Reputation," noting that "We maintain an 'Excellent Reputation' score as defined by our community partners."

122.    Moreover, Defendant Quinn emphasized in a different slide that USB's "brand value" grew 55% since 2016, resulting in "Strengthened Most Trusted Choice positioning," and "Deepened relationships with existing customers," as depicted in the following slide:



123.    In another slide, Defendant Quinn represented that "Trust and Reputation Are Foundational to All Constituencies," and emphasized "Prioritizing and building 'trust' at moments that matter most," as depicted in the following slide:



124.    At the 2019 Investor Conference, and accompanying the slide presentation, USB executives discussed USB to investors, expanding on the points and topics highlighted in the slides. In regards to the Company's priorities, Defendant Cecere stated:

Number one, relentlessly focusing on the customer. ***Everything we do at the company is with the customer in the center and all of our capabilities around that.*** The way we think about product development, technology, service, operations, communications, we're looking at the customer at the core of what we do.

125.    In addition, Defendant Quinn represented to investors during the 2019 Investor Conference that:

***[b]rand and culture are differentiators for U.S. Bank and they are fundamental to how we run our business.*** When we met last year in 2016, we talked about how ***strong brands drive better shareholder return. They also drive higher top line growth and they outperform the S&P 500.*** I'll tell you today what we've done on our brand journey since then, where we're positioned and what's next for us.

So increasingly, people are not just buying what you do, they're buying why you do it. So when we began our brand journey, we started from the inside out. We started with our culture, which is a unique combination of IQ and EQ and that is reflected in our purpose statement. We invest our hearts and minds to power human potential. The trend of culture is very important. So when you think about the sea of black and white banking, this gray space is really, really important, the space of brand and culture. It unifies and rallies employees and it's why is felt across all of our stakeholders.

The ***intersection of brand and culture is differentiating***, and it is really the unwritten rule set in which all decisions are made inside the company, an– where -- is felt to all of our stakeholders again and it's how we conduct business. We were at a leadership off-site this past summer and ***we asked our top 200 leaders what is the secret sauce of U.S. Bank***, and this is the word cloud that emerged from that. So for those of us who live and breathe it every day, it's no surprise that ***ethics, trust and collaboration rose to the top***.

\* \* \*

***Ethics and trust rises to the #1 spot for all customer segments, both consumers and businesses.***

\* \* \*

So we work on attracting, retaining and developing our relationships with both employees and customers. And we focus on 3 things: one, creating compelling journeys for them both. For example, personalizing their experiences with us; secondly, enhancing and enabling their digital lives. As Andy said, you'll hear the word digital throughout the day; and lastly, by establishing really deep and meaningful relationships with both. This helps us build our customer brand as well as our employee brand resulting again in revenue, retention and growth. **Trust will remain a competitive advantage for us.** It is not going anywhere. It is going to be a foundational driver, top driver of business in our industry.

126.    The Company's Vice Chairman of Consumer Banking Sales & Support, Timothy A. Welsh, stated at the 2019 Investor Conference:

We're becoming -- we're trying to become central to the lives of our customers. That's important. What that means is that we're really valuable to our customers that they depend on us, that they think of us, that they have an emotional connection to us in ways that are really meaningful. We're not just a mortgage that they pay or an auto loan bill. If a– that -- if that's all we are, then we're not doing anything to power their potential. So this concept of centrality is very important, and the core underlying element of it is the idea of engagement. What we're trying to do with our customers is engage with them as frequently as we can. Derek talked about this with the large tech companies. He highlighted the fact that they focus on time spent with them. That's an idea that we're trying to replicate, but we're trying to do it in a very important way. **We want to interact with our customers a lot, but we want to make sure that every time we do, we are helpful to them. If we are helpful to them and they interact with us a lot, it will help us build trust, which Kate and Andy highlighted, is so central to what we're doing. So that's really the core**.

127.    USB's Vice Chairman of Corporate & Commercial Banking, James B. Kelligrew, stated the following at the 2019 Investor Conference: "Our **best-in-class risk discipline** and I would add to that **our strong ethical culture really resonates well with our client base** with U.S. as a really safe and dependable long-term relationship."

128.    The aforementioned statements above were false, misleading, and omitted material facts because Defendants failed to disclose: (a) the Company was engaging in the Account Misconduct; (b) due to the foregoing, USB faced a foreseeable risk of greater

regulatory scrutiny or investigation, including by the CFPB; (c) the Company's revenues were in part the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2019 and 2020 Annual Reports*

129. On February 13, 2020, the Company published its 2019 Annual Report ("2019 Annual Report"), wherein it emphasized the Bank's "strong reputation," noting that "***Our culture, brand and reputation are sources of competitive advantage for U.S. Bank and differentiate us from our peers***." The Company also stated in the 2019 Annual Report that "Our brand value — the financial significance a brand carries — grew by 55% in the last three years[] in response to our efforts to build brand awareness and strategically market ourselves." USB further explained: "***Our commitment to operating with ethics and integrity and our focus on building trust are in everything we do***, and we're recognized for that work through accolades from organizations like The Ethisphere® Institute, Fortune®, Forbes® and DiversityInc®." The portion of the 2019 Annual Report reflecting these statements is set forth below:

130. Under a subheading in the 2019 Annual Report titled, "***The most trusted choice***," the Company represented "***Doing the right thing is in the DNA of our culture***, and we work hard to earn the privilege of trust and the opportunity to deepen it. We grow by investing in and staying true to our ethical culture, risk and financial discipline and our commitment to keeping customers safe and secure."

131.    In a section of the 2019 Annual Report titled, "Data science," the Company stated: "Being a central part of our customers' financial lives means we manage a tremendous amount of data and assume the responsibility for the ethical use of it. We're focused on strategic decisions through centralized data and analytics and we've built a dedicated team of experienced professionals to distill and protect that data to benefit our customers in meaningful ways."

132. On February 23, 2021, the Company issued its 2020 Annual Report ("2020 Annual Report"), wherein it stated: "There for everyone. '***We do the right thing' leads our core values***. The culture we built and nurture is the reason we were able to successfully navigate the events of 2020 and emerge even stronger. Our strength affords us the courage to be uncomfortable and examine areas where we can grow and implement meaningful change."

133. In a section of the 2020 Annual Report titled, "Ethics and business conduct," the Company stated: "Every business decision we make begins and ends with our commitment to ethics, to doing the right thing. ***Ethical behavior is at the core of our culture***. We know we need to work at it daily, in both big and small ways. At a time when our industry is experiencing rapid change and managing unprecedented challenges, our commitment to ethics

is a powerful constant in our culture and is continually reinforced from the very top of our company."

134.    Under a section of the 2020 Annual Report titled "Data protection and privacy," the Company stated: "We are committed to protecting the confidentiality, integrity, availability and privacy of customer data. Through clear and easily accessible policies, we tell our customers and online visitors why we collect information from them, how we will use it, and with whom we will share it. We also provide ongoing education and training to our employees and partners to ensure there are clear expectations on implementing and maintaining security and privacy technology and processes that protect our customers."

135.    The statements referenced above were false, misleading, and omitted material facts because Defendants failed to disclose: (a) the Company was engaging in the Account Misconduct; (b) due to the foregoing, USB faced a foreseeable risk of greater regulatory scrutiny or investigation, including by the CFPB; (c) the Company's revenues were in part the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

136.    The statements referenced above discussing the Bank's data protection and privacy practices and policies are also false, misleading, and omitted material facts because Defendants were aware of, but did not disclose, they were engaging in and/or causing the Company to engage in the Account Misconduct.

**_March 10, 2020 Proxy Statement_**

137.    On March 10, 2020, the Company filed a Schedule 14A (the "2020 Proxy") with the SEC that described the Company's "key sustainable and responsible business practices," including with respect to the Bank's customers, "protecting data" and "respecting privacy." Regarding the Bank's employees, USB identified "[b]usiness ethics" as a notable responsible business practice, stating that "[o]ur global ethics program is designed to give employees the information, tools and training they need to make the right choices, find guidance when they need it, and report concerns without fear of retaliation."

138.    The statements referenced above are false, misleading, and omitted material facts because Defendants failed to disclose: (a) the Company was engaging in the Account Misconduct; (b) due to the foregoing, USB faced a foreseeable risk of greater regulatory scrutiny or investigation, including by the CFPB; (c) the Company's revenues were in part the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

139.    These statements regarding the Company's "responsible business practices" are also false and misleading and omitted material facts because, as later revealed by the Consent Order, the CFPB ultimately required USB to submit for review a "comprehensive compliance plan" designed to ensure the Bank "complies with all applicable Federal consumer financial laws," including "policies and procedures to identify, manage, mitigate, and report risks and misconduct associated with sales- related behaviors."

*September 15, 2020, September 21, 2020, and December 8, 2021 Conferences*

140.    On September 15, 2020, USB filed a Current Report on Form 8-K with the SEC which attached as an exhibit presentation a slide entitled Barclays Global Financial Services Conference 2020. Therein, Defendants Cecere and Dolan presented a slide with the question, "What differentiates U.S. Bank?," to which they answered in part, "Culture of 'doing the right thing' for all our stakeholders."

141.    On September 21, 2021, USB filed a Current Report on Form 8-K with the SEC which attached as an exhibit presentation a slide entitled "USB to Acquire Union Bank from Mitsubishi UFJ Financial Group," in which the Company touted its "Culture rooted in 'doing the right thing' and supporting communities from a foundation of trust and ethics[.]"

142.    On December 8, 2021, USB filed a Current Report on Form 8-K with the SEC which attached as an exhibit presentation a slide entitled "Goldman Sachs U.S. Financial Services Conference 2021," (the "2021 Goldman Conference") in which Defendants Cecere and Dolan presented the following slide, proclaiming that USB's "***culture is rooted in 'doing the right thing'***":



143.    The statements referenced above are false, misleading, and omitted material facts because Defendants failed to disclose: (a) the Company was engaging in the Account Misconduct; (b) due to the foregoing, USB faced a foreseeable risk of greater regulatory scrutiny or investigation, including by the CFPB; (c) the Company's revenues were in part the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### Statements Regarding the "Most Ethical Company"

144.    In the 2019 Investor Day presentation slides discussed *supra*, USB shared that it was selected to Ethisphere's "***World's Most Ethical Companies***" for 2019, and as one of "***Fortune World's Most Admired Companies***" for 2019.

145.    In a series of Current Reports on Forms 8-K filed with the SEC by USB on October 16, 2019, November 13, 2019, December 10, 2019, and January 15, 2020, the Company attached as exhibits press releases that stated that "U.S. Bank is committed to serving its millions of retail, business, wealth management, payment, commercial and corporate, and investment services customers across the country and around the world as a trusted financial partner, a commitment recognized by the Ethisphere Institute naming the bank a ***2019 World's Most Ethical Company***."

146.    On February 25, 2020, the Company issued a press release titled "***U.S. Bank Named One of the 2020 World's Most Ethical Companies***," in which USB emphasized its "ethical business practices," and noted that "The Ethisphere Institute recognizes U.S. Bank

for the sixth consecutive year." In the press release, Defendant Cecere was quoted as stating, "***Our commitment to doing the right thing is at the heart of everything we do***," and "I'm proud of the work our employees do every day to earn and keep the ***trust*** of our customers."

147.    In various Current Reports on Forms 8-K filed with the SEC by USB on March 19, 2020, April 15, 2020, June 30, 2020, July 15, 2020, October 14, 2020, December 9, 2020, December 22, 2020, January 20, 2021, and January 27, 2021, the Company attached as exhibits press releases and presentations stating that, "U.S. Bank is committed to serving its millions of retail, business, wealth management, payment, commercial and corporate, and investment services customers across the country and around the world as a trusted financial partner, a commitment recognized by the Ethisphere Institute naming the bank one of the 2020 World's Most Ethical Companies." USB's Current Reports on Forms 8-K submitted to the SEC on September 15, 2020 and October 14, 2020 appended as exhibits a press release and presentations that also highlighted that USB was "One of the 2020 World's Most Ethical Companies, Ethisphere Institute[.]"

148.    In the 2022 Proxy Statement (defined below) and in Current Reports on Forms 8-K the Company filed with the SEC on June 28, 2021, July 15, 2021, September 21, 2021, October 14, 2021 and December 16, 2021, USB appended as exhibits press releases and presentations stating that "[t]he company has been recognized for its approach to digital innovation, social responsibility, and customer service, including being named one of the 2021 World's Most Ethical Companies and Fortune's most admired superregional bank."

149.    In a statement in the opening of USB's 2019 Annual Report, defendant Cecere referenced USB's selection as one of the "World's Most Ethical Companies" three separate times on the first page of the report and noted that, "We are committed to our communities and being a socially responsible corporate citizen. We are a Fortune® Most Admired Company, one of the Ethisphere® World's Most Ethical Companies®, among Forbes® best banks in America, and recognized in the DiversityInc® Top 50 for our focus on diversity, equity and inclusion." These statements contained on the first page of the 2019 Annual Report are depicted below:



Fellow shareholders: As a leadership team at U.S. Bancorp, we are proud of our position in the industry. We are one of the largest banks in the United States with global reach through our trust and payments businesses.

We have a diverse mix of profitable businesses. We have a strong culture, an efficient operating platform and healthy customer loyalty scores. We are committed to our communities and being a socially responsible corporate citizen. We are a Fortune® Most Admired Company, one of the Ethisphere® World's Most Ethical Companies,® among Forbes® best banks in America, and recognized in the DiversityInc® Top 50 for our focus on diversity, equity and inclusion. Our financial results continue to lead the

industry; at the end of 2019 on a full-year basis, we were among the best in class in return on assets, return on equity and efficiency. We are also one of the highest-rated banks in the world.

It is clear we are doing well, and we are committed to building on this position of strength.

Our focus as we face 2020 is how to retain those attributes and use them as differentiators while recognizing that they, alone, are insufficient in a changing world.

"World's Most Ethical Companies" and "Ethisphere" names and marks are registered trademarks of Ethisphere LLC.

150.    The 2020 Proxy also stated that USB was "Named one of the World's Most Ethical Companies by Ethisphere Institute in 2020, the sixth year in a row[.]"

151.  On April 21, 2020, Defendant Cecere stated the following at the USB Annual Shareholders Meeting:

> We also continue to be recognized outside the company for our efforts to be one of the best banks in the world. Fortune Magazine named USB World's Most Admired Company, recognizing several of our attributes as most admired among all companies, not just banks as well as naming us the world's most admired superregional bank for the 10th year in a row.
>
> Ethisphere Institute, a global leader in defining and advancing the standards of ethical business practices, announced 135 companies, spanning 23 countries and 57 industries, and *we were honored as a 2020 Most Ethical Company. USB was one of those for the sixth year in a row.*
>
> * * *
>
> I'm extremely proud of the strong team of leaders, our Board and our management team and the standard they set for more than 70,000 employees around the world. *Everyone is intensely focused on meeting the financial needs and objectives of our customers as we operate in a culture rooted in ethics and integrity*.

152.    In the 2020 Annual Report, the Company highlighted its inclusion as one of the Ethisphere® World's Most Ethical Companies® and stated: "The Harris Poll ranked us as America's most essential bank during COVID-19. The Ethisphere® Institute named us to the list of World's Most Ethical Companies® for the seventh consecutive year."

153.    In USB's SEC filings on March 4, 2021 (Current Report on Form 8-K appending as an exhibit a press release), March 9, 2021 (Definitive Proxy Statement on Schedule 14A) and April 15, 2021 (Current Report on Form 8-K appending as exhibits a press release and 1Q21 Earnings Conference Call Presentation), USB stated that "U.S. Bank is committed to serving its millions of retail, business, wealth management, payment, commercial, corporate, and investment customers across the country and around the world as a trusted and responsible financial partner. This commitment continues to earn a spot on the Ethisphere Institute's World's Most Ethical Companies list[.]"

154.    In the April 15, 2021 press release appended to Form 8-K, USB described itself as "Most Ethical" and stated that "*[f]or the seventh consecutive year, U.S. Bank has been named one of the World's Most Ethical Companies* by the Ethisphere Institute, a global leader in defining and advancing the standards of ethical business practices." The press release also highlighted the Company as "Most Admired" stating that "USB was ranked No. 1 in the Superregional Banks category for the eleventh straight year in Fortune magazine's annual World's Most Admired Companies list."

155.    The Company's Code of Ethics, as of July 2021, (discussed more fully below) stated on the cover that the Bank was named one of the World's Most Ethical Companies® in 2021 by the Ethisphere Institute.

156.    In the 2021 Goldman Conference, the Company underscored that it was "Named one of the **World's Most Ethical Companies** by The Ethisphere Institute for 7 consecutive years[.]"

157.    In the 2022 Proxy Statement, USB included a section on "Conduct," stating: "We are deeply committed to maintaining the *highest standards of ethical conduct* that reflect our purpose and *core values*. In recognition of that commitment, for the seventh consecutive year, we were named one of the World's Most Ethical Companies® in 2021 by the Ethisphere Institute."

158.    On April 14, 2022, the Company filed a Current Report on Form 8-K and appended as an exhibit a press release discussing the USB's first quarter 2022 results. Under the section "Most Ethical" the Company stated: "For the *eighth consecutive year, U.S. Bank has been named one of the World's Most Ethical Companies®* by the Ethisphere Institute,

a global leader in defining and advancing the standards of ethical business practices. Ethisphere recognized 136 honorees spanning 22 countries and 45 industries. U.S. Bank is one of five honorees in the banking category. The award recognizes companies' dedication to integrity, sustainability, governance and community." The April 14, 2022 press release also stated that "[t]he company has been recognized for its approach to digital innovation, social responsibility, and customer service, including being named one of the 2022 World's Most Ethical Companies and Fortune's most admired superregional bank." USB repeated this statement in a press release appended as an exhibit to a July 15, 2022 Current Report on Form 8-K.

159.    The statements referenced above are false and misleading and omitted material facts because Defendants failed to disclose: (a) the Company was engaging in the Account Misconduct; (b) due to the foregoing, USB faced a foreseeable risk of greater regulatory scrutiny or investigation, including by the CFPB; (c) the Company's revenues were in part the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### USB's "Ethics" Website Statement

160.    The Company has issued a statement on its website, currently available at https://www.usbank.com/about-us-bank/ethics.html , that has remained on the Company's website since at least as early as October 1, 2020, entitled "Ethics at U.S. Bank" and subtitled "Trust.," containing a statement by Defendant Cecere. In the webpage statement, Defendant

Cecere emphasizes USB's "commitment to **the highest ethical standards**," which he explains "is the foundation for our core values and guides every decision we make." Defendant Cecere also explains that USB's Code of Ethics "shows us how to be **the most trusted choice**," and that the Company's "**ethical leadership is driving the ways we're innovating to meet our customers' evolving expectations**." The full website statement maintained by USB throughout the Relevant Period in substantially similar form, is set forth below:

About U.S. Bank / Ethics

# Ethics at U.S. Bank

## Trust.

Relationships are the heart of our business. We build those relationships on trust-the trust each of us earns every day, through every interaction with our customers and the communities we serve.

Our commitment to the highest ethical standards is what makes that trust possible. This commitment is the foundation for our core values and guides every decision we make. It powers our ability to act as one U.S. Bank, no matter what part of the company we work in or where on the globe we sit.

Our Code of Ethics and Business Conduct shows us how to be the most trusted choice. Acting with integrity-and speaking up when we have concerns-is how we protect our customers and help them achieve their financial goals.

Our ethics program is designed to do one thing: give our 73,000 leaders and employees the training, tools and resources they need to do the right thing. Integrity has powered our business success for more than 150 years, and ethical leadership is driving the ways we're innovating to meet our customers' evolving expectations.

We understand our responsibility to earn our customers' trust every day. Our ethical culture powers our ability to do that.

Andy Cecere
Chairman, President and CEO

161.    The statements referenced above are false and misleading and omitted material facts because Defendants failed to disclose: (a) the Company was engaging in the Account Misconduct; (b) due to the foregoing, USB faced a foreseeable risk of greater regulatory scrutiny or investigation, including by the CFPB; (c) the Company's revenues were in part

the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *USB's Misleading Statements and Material Omissions Regarding USB's Risk Environment And Risk Management*

162.    During the Relevant Period, USB repeatedly characterized the relevant risks facing the Company as mere hypotheticals despite the fact that USB was under investigation by the CFPB throughout the Relevant Period for the Company's violations of consumer protection laws and regulations.

163.    On August 1, 2019, USB filed with the SEC its 2Q19 10-Q for the period ending June 30, 2019. In its "Corporate Risk Profile," USB stated the following:

> The Board of Directors, primarily through its Risk Management Committee, oversees performance relative to the risk management framework, risk appetite statements, and other policy requirements.

> The Executive Risk Committee ("ERC"), which is chaired by the Chief Risk Officer and includes the Chief Executive Officer and other members of the executive management team, oversees execution against the risk management framework and risk appetite statements. The ERC focuses on current and emerging risks, including strategic and reputational risks, by directing timely and comprehensive actions. Senior operating committees have also been established, each responsible for overseeing a specified category of risk. The Company's most prominent risk exposures are credit, interest rate, market, liquidity, operational, compliance, strategic, and reputational . . . Compliance risk is the risk that the Company may suffer legal or regulatory sanctions, material financial loss, or loss to reputation through failure to comply with laws, regulations, rules, standards of good practice, and codes of conduct. . .

> The Company's Board and management-level governance committees are supported by a "three lines of defense" model for establishing effective checks and balances. The first line of defense, the business lines, manages risks in conformity with established limits and policy requirements. In turn, business

line leaders and their risk officers establish programs to ensure conformity with these limits and policy requirements. The second line of defense, which includes the Chief Risk Officer's organization as well as policy and oversight activities of corporate support functions, translates risk appetite and strategy into actionable risk limits and policies. The second line of defense monitors first line of defense conformity with limits and policies, and provides reporting and escalation of emerging risks and other concerns to senior management and the Risk Management Committee of the Board of Directors. The third line of defense, internal audit, is responsible for providing the Audit Committee of the Board of Directors and senior management with independent assessment and assurance regarding the effectiveness of the Company's governance, risk management and control processes.

164.    The statements above were also repeated in substantially similar form in Forms 10-Q filed by USB on November 8, 2019, May 7, 2020, August 6, 2020, November 5, 2020, May 4, 2021, August 3, 2021, November 2, 2021 and May 3, 2022 (collectively, the "Relevant Period 10-Qs"); and the 2019 Annual Report, 2020 Annual Report and 2021 Annual Report issued by USB on or about February 25, 2022 ("2021 Annual Report" and collectively, "Relevant Period Annual Reports"); and Forms 10-K, each of which was signed by the Individual Defendants who were then members of the USB Board and Dolan, and filed with the SEC on February 20, 2020 for the fiscal year ending December 31, 2019 ("2019 10-K"), February 23, 2021 for the fiscal year ending December 31, 2020 ("2020 10-K") and February 22, 2022 for the fiscal year ending December 31, 2021 ("2021 10-K" and, collectively, the "Relevant Period 10-Ks").

165.    In addition, the August 1, 2019 10-Q also identified the following risks, which also appear in substantially similar form in the other Relevant Period 10-Qs, Relevant Period 10-Ks and Relevant Period Annual Reports:

**Operational Risk Management** Operational risk is inherent in all business activities, and the management of this risk is important to the achievement of the Company's objectives. Business lines have direct and primary

responsibility and accountability for identifying, controlling, and monitoring operational risks embedded in their business activities. ***The Company maintains a system of controls with the objective of providing proper transaction authorization and execution***, proper system operations, proper oversight of third parties with whom it does business, safeguarding of assets from misuse or theft, and ensuring the reliability and security of financial and other data. . .

**Compliance Risk Management** The Company ***may*** suffer legal or regulatory sanctions, material financial loss, or damage to its reputation through failure to comply with laws, regulations, rules, standards of good practice, and codes of conduct, including those related to compliance with Bank Secrecy Act/anti-money laundering requirements, sanctions compliance requirements as administered by the Office of Foreign Assets Control, ***consumer protection*** and other requirements. ***The Company has controls and processes in place for the assessment, identification, monitoring, management and reporting of compliance risks and issues.***

166.    The Company's September 12, 2019 Investor Day conference included a slide presented by Defendant Cecere which highlighted USB's purported "Best-in-class financial results and risk management," as reflected in the slide above, *supra*. In another slide, Cecere stated that the Bank is "Positioned to Win," including because its "risk discipline" is a "***differentiator***."

167.    In the 2019 Annual Report, under a section entitled "Operations and Business Risk," USB stated in pertinent part:

***The Company relies on its employees, systems and third parties to conduct its business, and certain failures by systems or misconduct by employees or third parties could adversely affect its operations.*** . . .

The Company could also incur losses resulting from the risk of fraud by employees or persons outside of the Company, unauthorized access to its computer systems, the execution of unauthorized transactions by employees, errors relating to transaction processing and technology, breaches of the internal control system and compliance requirements, and business continuation and disaster recovery. This risk of loss also includes the potential legal actions, fines or civil money penalties that could arise as a result of an

operational deficiency or as a result of noncompliance with applicable regulatory standards, adverse business decisions or their implementation, and customer attrition due to potential negative publicity.

\* \* \*

**The Company could face significant legal and reputational harm if it fails to safeguard personal information.** The Company is subject to complex and evolving laws and regulations, both inside and outside of the United States, governing the privacy and protection of personal information of individuals. The protected individuals can include the Company's customers, its employees, and the employees of the Company's suppliers, counterparties and other third parties. Ensuring that the Company's collection, use, transfer and storage of personal information comply with applicable laws and regulations in relevant jurisdictions can increase operating costs, impact the development of new products or services, and reduce operational efficiency. *Any mishandling or misuse of the personal information of customers, employees or others by the Company* or a third party affiliated with the Company *could expose the Company to litigation or regulatory fines, penalties or other sanctions.*

Additional risks could arise if the Company or third parties do not provide adequate disclosure or transparency to the Company's customers about the personal information collected from them and its use; any failure to receive, document, and honor the privacy preferences expressed by the Company's customers; any failure to protect personal information from unauthorized disclosure; or any failure to maintain proper training on privacy practices for all employees or third parties who have access to personal data. Concerns regarding the effectiveness of the Company's measures to safeguard personal information and abide by privacy preferences, or even the perception that those measures are inadequate, could cause the Company to lose existing or potential customers and thereby reduce its revenues. In addition, any failure or perceived failure by the Company to comply with applicable privacy or data protection laws and regulations could result in requirements to modify or cease certain operations or practices, significant liabilities or regulatory fines, penalties, or other sanctions.

\* \* \*

**Damage to the Company's reputation could adversely impact its business and financial results**. Reputation risk, or the risk to the Company's business, earnings and capital from negative public opinion, is inherent in the Company's business. *Negative public opinion about the* financial services industry generally or the *Company specifically could adversely affect the Company's ability to keep and attract customers, investors, and employees and could expose the Company to litigation and regulatory action.* Negative public opinion can result from the Company's actual or alleged conduct in any

number of activities, including lending practices, cybersecurity breaches, failures to safeguard personal information, discriminating or harassing behavior of employees toward other employees or customers, mortgage servicing and foreclosure practices, compensation practices, sales practices, environmental, social, and governance practices and disclosures, regulatory compliance, mergers and acquisitions, and actions taken by government regulators and community organizations in response to that conduct.

* * *

**The Company's framework for managing risks may not be effective in mitigating risk and loss to the Company**. The Company's risk management framework seeks to mitigate risk and loss. The Company has established processes and procedures intended to identify, measure, monitor, report, and analyze the types of risk to which it is subject, including liquidity risk, credit risk, market risk, interest rate risk, compliance risk, strategic risk, reputation risk, and operational risk related to its employees, systems and vendors, among others. However, as with any risk management framework, there are inherent limitations to the Company's risk management strategies as there may exist, or develop in the future, risks that it has not appropriately anticipated or identified. In addition, the Company relies on quantitative models to measure certain risks and to estimate certain financial values, and these models could fail to predict future events or exposures accurately. The Company must also develop and maintain a culture of risk management among its employees, as well as manage risks associated with third parties, and could fail to do so effectively. If the Company's risk management framework proves ineffective, the Company could incur litigation and negative regulatory consequences, and suffer unexpected losses that could affect its financial condition or results of operations.

168.    The statements above were repeated in substantially similar form in the other Relevant Period Annual Reports and Relevant Period 10-Ks.

169.    In the 2019 Annual Report and repeated in substantially similar form in the other Relevant Period Annual Reports and Relevant Period 10-Ks, under a section entitled "Regulatory and Legal Risk," USB stated:

**The Company is subject to extensive and evolving government regulation and supervision, which can increase the cost of doing business, limit the Company's ability to make investments and generate revenue, and lead to costly enforcement actions**. . . .

73

**The Company is subject to significant financial and reputation risks from potential legal liability and governmental actions**. The Company faces significant legal risks in its businesses, and the volume of claims and amount of damages and penalties claimed in litigation and governmental proceedings against it and other financial institutions are substantial. Customers, clients and other counterparties are making claims for substantial or indeterminate amounts of damages, while banking regulators and certain other governmental authorities have focused on enforcement. As a participant in the financial services industry, it is likely that the Company will continue to experience a high level of litigation related to its businesses and operations in the future. . . Substantial legal liability or significant governmental action against the Company could materially impact its financial condition and results of operations or cause significant reputational harm to the Company, which in turn could adversely impact its business prospects. Also, the resolution of a litigation or regulatory matter could result in additional accruals or exceed established accruals for a particular period, which could materially impact the Company's results from operations for that period.

170.    USB's 2019 10-K contained generic, boilerplate representations regarding the

risks it faced as an entity subject to consumer protection and CFPB oversight, stating, in

relevant parts:

*Consumer Protection Regulation* U.S. Bank National Association's retail banking activities are subject to a variety of statutes and regulations designed to protect consumers, including laws related to fair lending and the prohibition of unfair, deceptive, or abusive acts or practices in connection with the offer, sale, or provision of consumer financial products and services. These laws and regulations include the Truth-in-Lending, Truth-in-Savings, Home Mortgage Disclosure, Equal Credit Opportunity, Fair Credit Reporting, Fair Debt Collection Practices, Real Estate Settlement Procedures, Electronic Funds Transfer, Right to Financial Privacy and Servicemembers Civil Relief Acts. Interest and other charges collected or contracted for by banks are subject to state usury laws and federal laws concerning interest rates.

*Consumer Financial Protection Bureau* U.S. Bank National Association and its subsidiaries are subject to supervision and regulation by the CFPB with respect to federal consumer laws, including many of the consumer protection laws and regulations described above. The CFPB has undertaken numerous rule-making and other initiatives, including issuing informal guidance and taking enforcement actions against certain financial institutions. The CFPB's rulemaking, examination and enforcement authority has affected and will continue to impact financial institutions involved in the provision of consumer financial products and services, including the Company, U.S. Bank National Association, and the Company's other subsidiaries. These regulatory activities

may limit the types of financial services and products the Company may offer, which in turn may reduce the Company's revenues.

171.    The statements above were repeated in substantially similar form in the 2020 10-K and 2021 10-K.

172.    The Relevant Period 10-Ks discussed the Company's "Corporate Risk Profile" and stated, in pertinent part:

> ***Management regularly provides reports to the Risk Management Committee of the Board of Directors. The Risk Management Committee discusses with management the Company's risk management performance, and provides a summary of key risks to the entire Board of Directors, covering the status of existing matters, areas of potential future concern*** and specific information on certain types of loss events. The Risk Management Committee considers quarterly reports by management assessing the Company's performance relative to the risk appetite statements and the associated risk limits, including. . .
>
> Operational and compliance risk, including losses stemming from events such as fraud, processing errors, control breaches, breaches in data security or adverse business decisions, as well as reporting on technology performance, and various legal and regulatory compliance measures[.]

173.    Appended as exhibits to the Relevant Period 10-Qs and Relevant Period 10-Ks were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Cecere and Dolan certified that the Relevant Period 10-Qs and Relevant Period 10-Ks fully comply with the requirements of §13(a) or §15(d) of the Securities Exchange Act of 1934 and the information contained therein fairly presents, in all material respects, the financial condition and results of operations of the Company.

174.    In the 2019 Annual Report, and repeated in material part in the 2020 Annual Report, 2019 10-K and 2020 10-K, under a section entitled "Litigation and Regulatory Matters," USB stated:

The Company is subject to various litigation and regulatory matters that arise in the ordinary course of its business. The Company establishes reserves for such matters when potential losses become probable and can be reasonably estimated. The Company believes the ultimate resolution of existing legal and regulatory matters will not have a material adverse effect on the financial condition, results of operations or cash flows of the Company. However, in light of the uncertainties inherent in these matters, it is possible that the ultimate resolution of one or more of these matters may have a material adverse effect on the Company's results from operations for a particular period, and future changes in circumstances or additional information could result in additional accruals or resolution in excess of established accruals, which could adversely affect the Company's results from operations, potentially materially.

* * *

**Regulatory Matters**. The Company is continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection. . . . The Company is cooperating fully with all pending examinations, inquiries and investigations, any of which could lead to administrative or legal proceedings or settlements. Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the Company's business practices (which may increase the Company's operating expenses and decrease its revenue).

175. On June 4, 2021, Defendant Cecere presented at Bernstein's Strategic Decisions Conference (the "Bernstein's Conference"). During the presentation, Defendant Cecere stated the following:

Unidentified Analyst: The first one is around the regulatory environment. ***What's your sense of how things might evolve on regulation? And which areas of interest to the regulators these days are most relevant to U.S. Bank?***

Andy Cecere: So I do think, as an industry, there's going to be continued focus, certainly on ESG. That's an area that we have a lot of focus on. . . . ***The other area, John, is in consumer protection, and consumer activities. And maybe I'll just comment on overdrafts because I know that's a very topical subject. We've been very focused on this for a number of years.*** Our overdraft fees have been coming down, partly because we're sending notifications to customers to let them know about situations, that given their spent habits and inflow history, they may result in an overdraft situation, and set of actions they can take to avoid that.

76

Unidentified Analyst: So Andy, to summarize then, you are giving customers more information and more choice and maybe a little bit more time to kind of choose how they want these things to be addressed and processed? \

Andy Cecere: Yes. It has been a focus for us for a while. . . .

176. The statements referenced above are false and misleading and omitted material facts because Defendants failed to disclose: (a) the Company was engaging in the Account Misconduct; (b) due to the foregoing, USB faced a foreseeable risk of greater regulatory scrutiny or investigation, including an investigation by the CFPB; (c) the Company's revenues were in part the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

177. The statements referenced above are also false and misleading and omitted material facts because the Company issued generic, boilerplate representations regarding the risks it faced, stating the relevant risks as mere hypotheticals despite the fact that the Company was under investigation by the CFPB for years, including throughout the Relevant Period, regarding improper sales practices and violations of related consumer protection laws. Moreover, the statements referenced above contained in the September 2019 Investor Day conference are false and misleading because the Company described its risk management as "[b]est- in-class" and "risk discipline" as a "differentiator" despite severe deficiencies in the Company's risk management systems uncovered by the CFPB following its then-ongoing investigation, which determined that U.S. Bank knew that sales pressure was leading employees to open unauthorized accounts going back to 2010.

178.    Furthermore, the statements referenced above contained in the 2019 10-K, 2020 10-K, 2019 Annual Report and 2020 Annual Report discussing existing regulatory matters are materially false and misleading because they failed to disclose that the Company had been the subject of an ongoing, years-long CFPB investigation relating to the Company's consumer sales practices and conduct in violating consumer protection laws and regulations, including the CFPA, TILA, TISA and FCRA.

**Defendants' False and Misleading Statements and Omissions regarding the CFPB Investigation**

179.    On May 4, 2021, USB filed its Form 10-Q with the SEC for the first quarter of 2021, which states, in pertinent part:

> The Company is continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third- party risk management and consumer protection. **For example, the [CFPB] is investigating certain of the Company's consumer sales practices, and the Company has responded and continues to respond to the CFPB**. The Company is cooperating fully with all pending examinations, inquiries and investigations, any of which could lead to administrative or legal proceedings or settlements. Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the Company's business practices (which may increase the Company's operating expenses and decrease its revenue).

180.    The statements above were repeated in material respect in the 2021 10-K and Forms 10-Q filed with the SEC on August 3, 2021 and November 2, 2021.

181.    On May 3, 2022, USB filed a Form 10-Q with the SEC for the first quarter of 2022, which stated, in relevant part:

> **Regulatory Matters** The Company is continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection. For example, **the [CFPB] has been investigating certain of the Company's consumer sales practices and is now considering a potential**

***enforcement action***. The Company is engaged in discussions with the CFPB on this matter and does not believe an enforcement action is warranted, but there can be no assurance that these discussions will result in a resolution. The Company is cooperating fully with all pending examinations, inquiries and investigations, any of which could lead to administrative or legal proceedings or settlements. Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the Company's business practices (which may increase the Company's operating expenses and decrease its revenue).

182.    The statements referenced above are false and misleading and omitted material facts because Defendants failed to disclose: (a) the Company was engaging in the Account Misconduct; (b) due to the foregoing, USB faced a foreseeable risk of greater regulatory scrutiny or investigation, including an investigation by the CFPB; (c) the Company's revenues were in part the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times. The statements referenced above were also false and misleading because they misleadingly indicated that it was ***possible*** that some of the Company's unspecified sales practices ***might*** violate relevant laws and regulations or that USB ***may*** be subject to a fine or penalty when, in fact, Defendants knew of the Accounting Misconduct since 2010 and that such conduct resembled similar conduct that the CFPB had determined was unlawful in connection with the Wells Fargo enforcement action in 2016.

***USB's False and Misleading Statements and Omissions Regarding its Code of Ethics***

183.    In the 2019 10-K, 2020 10-K and 2021 10-K, USB stated: "[t]he Company has adopted a Code of Ethics and Business Conduct that applies to its principal executive officer,

principal financial officer and principal accounting officer. The Company's Code of Ethics and Business Conduct can be found at www.usbank.com[.]"

184.    The Company's Code of Ethics, as detailed in a July 2021 version of the code, was supposedly issued as a "guide to doing the right thing and living [the Bank's] core values." The Code of Ethics applies to "everyone who works at U.S. Bank," including the Company's directors. According to the Code of Ethics: "[i]n the unlikely event a waiver to this Code is requested by an executive officer or director, it must be approved by the USB Board of Directors and promptly disclosed. The chief executive officer must approve any waivers of the Code for employees in writing."

185.    The Code of Ethics contained an opening statement from Defendant Cecere and Senior Vice President, Global Chief Ethics Officer, Katie Lawler, that represented:

- "Our commitment to ethics will always be our strength."
-  "The things we say and do define who we are to those around us. Whether we are keeping our commitments, taking the high road, or looking for the right solution – not just the easy one, we are showing the world that we can be counted on for our ethics and integrity."
- "Our core values" . . . "We do the right thing. . . We put people first."

186.    Throughout the document, the Code of Ethics reiterated the phrase, "We do the right thing," For example, in a section titled "We do the right thing," the Code of Ethics stated in pertinent part: "Our commitment to high ethical standards is the foundation of our purpose and core values. Demonstrating our core values every day through our words and actions is how we strengthen our ethical culture, deliver a superior customer experience and elevate our brand." Additionally, on the very last page of the Code of Ethics, under a large header entitled, "We do the right thing," USB made the following statement: "Our Code of Ethics and Business Conduct is our shared guidebook to operating with integrity. In every

part of our business around the world, our ethical culture guides how we do what we do for our customers, communities and each other."

187.    In a section titled "Our customers and business partners," the Code of Ethics provided: "Our customer relationships are built on *trust*—trust we earn every day, through every interaction. ***We do what's best for our customers while protecting their interests*** and ours. Creating the best possible customer experience is another way we live our core values and strengthen our brand."

188.    In a section titled "Responsible marketing, sales and servicing activities," the Code of Ethics provided in pertinent part, "When we have an experience that doesn't meet our standards, may not comply with the letter or spirit of the law or may create undue risk for our customers, we act promptly to do the right thing. ***Sales always must be based on customer needs or requests—they should never be the result of efforts to promote products or services to meet incentive, sales or recognition goals***."

189.    In a section titled "Sales practices," the Code of Ethics stated, in part, "***Incentive gaming and aggressive, deceptive, unfair or abusive sales practices are prohibited. You may not manipulate records, open bogus accounts, sell products and/or open accounts without a customer's affirmative consent, falsify applications*** or skew results in any way for the benefit of yourself or other employees."

190.    In a section titled "Our shareholders," the Code of Ethics stated, in part, "***Our reputation is our most valuable asset, and it's the cornerstone of our brand***. . ."

191.    The statements in above were materially false and misleading because they failed to disclose material facts about the Company's business, revenue, and prospects. In

particular, Defendants failed to disclose, *inter alia*: (a) the Company was engaging in the Account Misconduct; (b) due to the foregoing, USB faced a foreseeable risk of greater regulatory scrutiny or investigation; (c) the Company's revenues were in part the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

192.    Defendants' statements referenced above about USB's ethics were also false and misleading because they created the misleading impression that USB employed "high ethical standards" when, in fact, Defendants knew that USB was engaged in the Accounting Misconduct for years as detailed above.

### *2022 Proxy Statement*

193.    On March 8, 2022, USB filed a Schedule 14A with the SEC (the "2022 Proxy Statement"). The following individuals, *inter alia*, solicited the 2022 Proxy Statement: Defendants Baxter, Bridges, Buse, Cecere, Ellison-Taylor, Harris, Hernandez, McKenney, Mehdi, Wiehoff, and Wine. The 2022 Proxy Statement was filed pursuant to Section 14(a) of the Exchange Act and contained material misstatements and omissions.

194.    The 2022 Proxy Statement asked shareholders to vote to approve, *inter alia*: (i) the reelection of Defendants Baxter, Bridges, Buse, Cecere, Ellison-Taylor, Harris, Hernandez, McKenney, Mehdi, Wiehoff, and Wine to the Board; (ii) the ratification of the selection of Ernst & Young LLP as USB's independent auditor for the 2022 fiscal year, and

(iii) an advisory vote to approve the compensation of USB's executives disclosed in the 2022 Proxy Statement.

195.    The 2022 Proxy Statement said the following about the role of the Board in risk oversight:

**Board-level oversight of risk management structure**
As part of its responsibility to oversee the management, business and strategy of our company, the Board of Directors has approved a Risk Management Framework that establishes governance and risk management requirements for all risk-taking activities. This framework includes company-level and business unit Risk Appetite Statements that set boundaries for the types and amount of risk that may be undertaken in pursuing business objectives and initiatives.

The Board of Directors oversees management's performance relative to the Risk Management Framework, Risk Appetite Statements, and other policy requirements. While management is responsible for defining the various risks facing our company, formulating risk management policies and procedures, and managing risk exposures on a day-to-day basis, the Board's responsibility is to oversee our company's risk management processes by informing itself about our material risks and evaluating whether management has reasonable risk management and control processes in place to address those material risks. The Board's risk oversight responsibility is primarily carried out through its standing committees[.]

196.    The 2022 Proxy Statement stated the following regarding the Code of Ethics:

We are deeply committed to maintaining the highest standards of ethical conduct that reflect our purpose and core values. In recognition of that commitment, for the seventh consecutive year, we were named one of the World's Most Ethical Companies® in 2021 by the Ethisphere Institute.

Our Code of Ethics and Business Conduct, which is available on our website at usbank.com by clicking on "About us", "Investor relations", "Corporate Governance" and then "Governance documents", outlines the responsibilities of every employee and director to our customers and business partners, our shareholders, our community and each other.

197.    The statements made in the 2022 Proxy Statement were materially false and misleading because, contrary to the representations in the 2022 Proxy Statement, the Board

failed to following the Company's Code of Ethics, which is further indicated by the Individual Defendants: (i) making and/or causing USB to make a series of false and misleading statements and/or omissions alleged herein; (ii) participating and/or facilitating the Company's participation in the Account Misconduct and the Consumer Misconduct; and (ii) failing to properly report these violations of the Code of Ethics. Moreover, the statements in 2022 Proxy Statement about the Board's risk oversight functions were materially false and misleading because the Board was failing to adequately perform its risk oversight functions.

198.    The statements made in the 2022 Proxy Statement were also materially false and misleading because they failed to disclose, *inter alia*, that: (a) the Company was engaging in the Account Misconduct and the Consumer Misconduct; (b) due to the foregoing, USB faced a foreseeable risk of greater regulatory scrutiny or investigation; (c) the Company's revenues were in part the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

199.    Consequently, the false and misleading statements that the Individual Defendants made and/or caused the Company to make in the 2022 Proxy Statement caused shareholders to, among other things, vote to re-elect Defendants Baxter, Bridges, Buse, Cecere, Ellison-Taylor, Harris, Hernandez, McKenney, Mehdi, Wiehoff, and Wine to the Board, thereby enabling those Defendants to continue breaching their fiduciary duties to USB.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

84

200.    As stated above, investors began to learn the truth about USB's consumer sales practices when the CFPB issued the Consent Order on July 28, 2022. The Consent Order revealed extensive misconduct performed by U.S. Bank and/or its employees, including: (1) the application and issuance of credit cards and lines of credit for customers without their knowledge and consent; (2) the use or procurement of consumer reports of consumers who were not seeking an extension of credit from or involved in any form of credit transaction, account review or account collection with the Company, where employees and the Bank had no other permissible purpose for the consumer reports it used or obtained; (3) the opening of consumer deposit accounts without consumers' knowledge and consent; and (4) creating sales pressure on its employees that led to employees opening credit cards, lines of credit, and deposit accounts without consumers' knowledge and consent. In addition, the CFPB determined that U.S. Bank violated the TILA and its implementing regulation, Regulation Z; the FCRA; the TISA, and its implementing regulation, Regulation DD, 12 C.F.R. part 1030; and the CFPA. The CFPB also fined the Company $37.5 million and ordered the Company to submit a compliance plan designed to ensure the Company's relevant conduct complies with all applicable federal consumer financial laws and the terms of the Order.

201.    Analysts responded negatively to this news, with Piper Sandler noting on July 28, 2022 with respect to the Consent Order, "this is obviously a ***negative*** and something the story could have done without . . . these are just headlines no investor likes to read, especially from such as [sic] highly regarded company," and explained that "[a]s for potential stock price ramifications, as one might expect, the shares are underperforming today" and the issue will likely "keep the stock in check for the time being." On July 29, 2022, Bank of America also

connected the stock price drop to the revelations from the Consent Order, publishing that "USB shares underperformed peers by 400bp on Thursday after the bank entered a consent order with the Consumer Financial Protection Bureau (CFPB) tied to its sales practices between 2010-2020." JP Morgan also expressed concern, noting that a "*[k]ey concern is cost of customer remediation and further fines similar to Wells Fargo*" given "the initial CFPB fine for Wells' fake account scandal was relatively small ($100 mil), *[but] it led to billions of dollars in costs from customer and investor class-action law suits, and settlements with State Attorney Generals, the Department of Justice, and the SEC*."

202.    On the news of the Consent Order, the price of USB stock declined $2.00, or 4%, to close at $46.12 on July 28, 2022. However, despite the truth beginning to emerge, the Defendants continued to make false and misleading statements and failed to remediate the deficient internal controls at the Company, thereby harming the Company.

### 2023 Proxy Statement

203.    On March 7, 2023, USB filed the 2023 Proxy Statement with the SEC. The following individuals, *inter alia*, solicited the 2023 Proxy Statement: Defendants Baxter, Bridges, Buse, Cecere, Ellison-Taylor, Harris, Hernandez, McKenney, Mehdi, Wiehoff, and Wine. The 2023 Proxy Statement was filed pursuant to Section 14(a) of the Exchange Act and contained material misstatements and omissions.

204.    The 2023 Proxy Statement asked shareholders to vote to approve, *inter alia*: (i) the reelection of Defendants Baxter, Bridges, Buse, Cecere, Ellison-Taylor, Harris, Hernandez, McKenney, Mehdi, Wiehoff, and Wine to the Board; (ii) the ratification of the selection of Ernst & Young LLP as USB's independent auditor for the 2023 fiscal year, and

(iii) an advisory vote to approve the compensation of USB's executives disclosed in the 2023 Proxy Statement.

205.    The 2023 Proxy Statement said the following about the role of the Board in risk oversight:

> **Board-level oversight of risk management structure**
> As part of its responsibility to oversee the management, business and strategy of our company, the Board of Directors has approved a Risk Management Framework that establishes governance and risk management requirements for all risk-taking activities. This framework includes company-level and business unit Risk Appetite Statements that set boundaries for the types and amount of risk that may be undertaken in pursuing business objectives and initiatives.
>
> The Board of Directors oversees management's performance relative to the Risk Management Framework, Risk Appetite Statements, and other policy requirements. While management is responsible for defining the various risks facing our company, formulating risk management policies and procedures, and managing risk exposures on a day-to-day basis, the Board's responsibility is to oversee our company's risk management processes by informing itself about our material risks and evaluating whether management has reasonable risk management and control processes in place to address those material risks. The Board's risk oversight responsibility is primarily carried out through its standing committees[.]

206.    The 2023 Proxy Statement stated the following regarding the Code of Ethics:

> We are deeply committed to maintaining the highest standards of ethical conduct that reflect our purpose and core values. In recognition of that commitment, for the seventh consecutive year, we were named one of the World's Most Ethical Companies® in 2021 by the Ethisphere Institute.
>
> Our Code of Ethics and Business Conduct, which is available on our website at usbank.com by clicking on "About us", "Investor relations", "Corporate Governance" and then "Governance documents", outlines the responsibilities of every employee and director to our customers and business partners, our shareholders, our community and each other.

207.    The statements made in the 2023 Proxy Statement were materially false and misleading because, contrary to the representations in the 2023 Proxy Statement, the Board

failed to following the Company's Code of Ethics, and the statements in 2023 Proxy Statement about the Board's risk oversight functions were materially false and misleading because the Board was failing to adequately perform its risk oversight functions.

208.    The statements made in the 2023 Proxy Statement were also materially false and misleading because they failed to disclose, *inter alia*, that: (a) the Company's internal controls remained deficient after the truth began to emerge when the CFPB issued its consent order; (b) as a result, the Company continued to face heightened risks of regulatory scrutiny and investigation, including by the CFPB and the OCC; and (c) due to the foregoing, the Company's statements were materially false and/or misleading at all relevant times.

209.    Consequently, the false and misleading statements that the Individual Defendants made and/or caused the Company to make in the 2023 Proxy Statement caused shareholders to, among other things, vote to re-elect Defendants Baxter, Bridges, Buse, Cecere, Ellison-Taylor, Harris, Hernandez, McKenney, Mehdi, Wiehoff, and Wine to the Board, thereby enabling those Defendants to continue breaching their fiduciary duties to USB.

### *May 8, 2023, August 7, 2023, and November 1, 2023 Forms 10-Q*

210.    On May 8, 2023, August 7, 2023, and November 1, 2023, the Company filed Forms 10-Q with the SEC for the first, second, and third quarters of 2023, respectively (together, the "2023 10-Qs").

211.    Regarding the Company's "Corporate Risk Profile," the 2023 10-Qs stated the following:

**Overview**
Managing risks is an essential part of successfully operating a financial services company. The Company's Board of Directors has approved a risk management framework which establishes governance and risk management

requirements for all risk-taking activities. This framework includes Company and business line risk appetite statements which set boundaries for the types and amount of risk that may be undertaken in pursuing business objectives and initiatives. The Board of Directors, primarily through its Risk Management Committee, oversees performance relative to the risk management framework, risk appetite statements, and other policy requirements.

212.    Regarding the Company's "Ethics," the 2023 10-Qs stated the following:

At U.S. Bancorp, our commitment to high ethical standards guides everything we do. Demonstrating this commitment through our words and actions is how each of us does the right thing every day for our customers, shareholders, communities and each other. Our ethical culture has been recognized by the Ethisphere Institute, which again named us to its World's Most Ethical Companies ® list.

213.    The statements referenced above were false and misleading and failed to disclose material facts about the Company's business, operations, and prospects. In particular, Defendants failed to disclose that: (a) the Company's internal controls remained deficient after the truth began to emerge when the CFPB issued its consent order; (b) as a result, the Company continued to face heightened risks of regulatory scrutiny and investigation, including by the CFPB and the OCC; and (c) due to the foregoing, the Company's statements were materially false and/or misleading at all relevant times.

**THE TRUTH FULLY EMERGES**

214.    The truth fully emerged on December 19, 2023 when the CFPB issued a press release announcing that the "(CFPB) today ordered U.S. Bank to pay ***nearly $21 million for keeping out-of-work consumers from accessing unemployment benefits*** at the height of the COVID-19 pandemic." The press release further revealed that U.S. Bank "froze tens of thousands of accounts" but "failed to provide people a reliable and quick way to regain access.

The CFPB's order required U.S. Bank to pay $5.7 million to consumers and a $15 million penalty to the CFPB.

215.    Separately, the Office of the Comptroller of the Currency ("OCC") fined U.S. Bank $15 million for the aforementioned misconduct, after the CFPB and OCC coordinated to investigate U.S. Bank's illegal conduct.

## INSIDER SALES

216.    During the Relevant Period, Defendants Cecere, Dolan, Richard, and Quinn made insider sales at prices artificially inflated by the false and misleading statements at issue for collective proceeds of more than $26 million.

217.    Defendant Cecere sold 349,751 shares of his personally held stock for proceeds of $20,139,701 in November 2019 and April 2021 while in possession of material nonpublic information.

218.    Defendant Dolan sold 86,349 shares of his personally held stock for proceeds of $4,288,645 between November 2019 and April 2021 while in possession of material nonpublic information.

219.    Defendant Richard sold 2,600 shares of her personally held stock for proceeds of $154,986 in November 2019 while in possession of material nonpublic information.

220.    Defendant Quinn sold 25,000 shares of her personally held stock for proceeds of $1,536,750 in May 2021 while in possession of material nonpublic information.

221.    All of the sales by the aforementioned defendants detailed above were made after the CFPB investigation began and before the CFPB disclosed the full scope of the Company's unlawful acts and practices to the investing public. Furthermore, Defendants

Cecere and Dolan collectively sold over $11.5 million worth of stock shortly before USB's May 4, 2021 initial disclosure of the CFPB's investigation of the Company's "consumer sales practices."

222.    The aforementioned insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate the Individual Defendants' motive in facilitating and participating in the schemes.

## REPURCHASES DURING THE RELEVANT PERIOD

223.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of $5.8 billion to repurchase approximately 106 million shares of its own common stock at artificially inflated prices from the fourth quarter of 2019 through the second quarter of 2022.

224.    According to the Form 10-Q the Company filed with the SEC on November 8, 2019 for the quarterly period ended September 30, 2019 (the "3Q 2019 10-Q"), during the third quarter of 2019, from August through September 2019, the Company purchased 3,815,073 shares of its common stock for approximately $208,760,795 at an average price of $54.72 per share.

225.    As the Company's stock was actually worth only $46.12 per share, the price at closing on July 28, 2022, the Company overpaid by approximately $32,809,628 for repurchases of its own stock between August 2019 and September 2019.

226.     According to the Form 10-K the Company filed with the SEC on February 20, 2020 for the quarterly period ended December 31, 2019 (the "4Q 2019 10-K"), during the fourth quarter of 2019, from October 2019 through December 2019, the Company purchased 39,121,951 shares of its common stock for approximately $2,405,000,000 at an average price of $58.90 per share.

227.     As the Company's stock was actually worth only $46.12 per share, the price at closing on July 28, 2022, the Company overpaid by approximately $600,695,619 for repurchases of its own stock between October 2019 and December 2019.

228.     According to the Form 10-Q the Company filed with the SEC on May 7, 2020 for the quarterly period ended March 31, 2020 (the "1Q 2020 10-Q"), during the first quarter of 2020, from January 2020 through March 2020, the Company purchased 31,678,774 shares of its common stock for approximately $1,683,093,262 at an average price of $53.13 per share.

229.     As the Company's stock was actually worth only $46.12 per share, the price at closing on July 28, 2022, the Company overpaid by approximately $222,068,206 for repurchases of its own stock between January 2020 and March 2020.

230.     According to the Form 10-Q the Company filed with the SEC on May 4, 2021 for the quarterly period ended March 31, 2021 (the "1Q 2021 10-Q"), during the first quarter of 2021, the Company purchased 13,740,798 shares of its common stock for approximately $667,115,743 at an average price of $48.55 per share.

231.    As the Company's stock was actually worth only $46.12 per share, the price at closing on July 28, 2022, the Company overpaid by approximately $33,390,139 for repurchases of its own stock between January 2021 and March 2021.

232.    According to the Form 10-Q the Company filed with the SEC on August 3, 2021 for the quarterly period ended June 30, 2021 (the "2Q 2020 10-Q"), during the second quarter of 2022, from April 2021 through June 2021, the Company purchased 15,183,981 shares of its common stock for approximately $896,158,558 at an average price of $59.02 per share.

233.    As the Company's stock was actually worth only $46.12 per share, the price at closing on July 28, 2022, the Company overpaid by approximately $195,873,354 for repurchases of its own stock between April 2021 and June 2021.

234.    According to the Form 10-Q the Company filed with the SEC on November 2, 2021 for the quarterly period ended September 30, 2021 (the "3Q 2021 10-Q"), during the third quarter of 2021, from July 2021 through September 2021, the Company purchased 81,091 shares of its common stock for approximately $4,705,711 at an average price of $58.03 per share.

235.    As the Company's stock was actually worth only $46.12 per share, the price at closing on July 28, 2022, the Company overpaid by approximately $965,794 for repurchases of its own stock between July 2021 and September 2021.

236.    According to the Form 10-K the Company filed with the SEC on February 22, 2022 for the quarterly period ended December 31, 2021 (the "4Q 2021 10-Q"), during the fourth quarter of 2021, from October 2021 through December 2021, the Company purchased

617,481 shares of its common stock for approximately $35,832,422 at an average price of $58.03 per share.

238. As the Company's stock was actually worth only $46.12 per share, the price at closing on July 28, 2022, the Company overpaid by approximately $28,478,223 for repurchases of its own stock between October 2021 and December 2021.

238. According to the Form 10-Q the Company filed with the SEC on May 3, 2022 for the quarterly period ended March 31, 2022 (the "1Q 2022 10-Q"), during the first quarter of 2022, from January 2022 through March 2022, the Company purchased 1,240,717 shares of its common stock for approximately $71,179,934 at an average price of $57.37 per share.

239. As the Company's stock was actually worth only $46.12 per share, the price at closing on July 28, 2022, the Company overpaid by approximately $13,958,066 for repurchases of its own stock between January 2022 through March 2022.

240. According to the Form 10-Q the Company filed with the SEC on August 4, 2022 for the quarterly period ended June 30, 2022 (the "2Q 2022 10-Q"), during the second quarter of 2022, from April 2022 through June 2022, the Company purchased 309,698 shares of its common stock for approximately $16,429,479 at an average price of $53.05 per share.

241. As the Company's stock was actually worth only $46.12 per share, the price at closing on July 28, 2022, the Company overpaid by approximately $2,146,207 for repurchases of its own stock between April 2022 and June 2022.

242. Thus, in total, during the Relevant Period, the Company spent $5.8 billion repurchasing 105,789,564 shares at artificially inflated prices representing an overpayment of over $1 billion.

## DAMAGES TO USB

243.     As a direct and proximate result of the Individual Defendants' misconduct, USB has lost and will continue to lose and expend many millions of dollars.

244.    Such losses include over $1 billion the Company overpaid for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

245.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgement associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

246.    Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Account Misconduct, and the $37.5 million the Company was fined by the CFPB as a result of the Account Misconduct.

247.    Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Consumer Misconduct, and the $36 million the Company was fined by the CFPB and OCC as a result of the Consumer Misconduct.

248.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, including the Account Misconduct and Consumer Misconduct, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

249.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

250.    As a direct and proximate result of the Individual Defendants' conduct, USB has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

251.    Plaintiff brings this action derivatively and for the benefit of USB to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of USB, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a),  10(b), and 20(a) of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

252.    USB is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

253.    Plaintiff is, and has been at all relevant times, a shareholder of USB. Plaintiff will adequately and fairly represent the interests of USB in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

254.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

255.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following thirteen individuals: Defendants Baxter, Bridges, Buse, Cecere, Ellison-Taylor, Harris, Hernandez, McKenney, Mehdi, Wiehoff, and Wine (the "Director Defendants"), along with non-parties Alan B. Colberg and Loretta E. Reynolds (together with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to seven of the thirteen Directors who are on the Board at the time this action is commenced.

256.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the Account Misconduct and the Consumer Misconduct, to make and/or cause the Company to make false and misleading statements and omissions of material facts and, at the same time, to cause the Company to overpay for repurchases of its own stock, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

257.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted the Company to issue materially false and misleading statements. Specifically, the Director-Defendants caused the Company to issue false and misleading statements which were intended to make USB appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to

maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

258.    Additional reasons that demand on Defendant Cecere is futile follow. Defendant Cecere is the Company's President, CEO, a Company director, and Chairman of the Board. He has served as a Company director since 2017 and as Chairman of the Board since April 2018. He also serves as Chair of the Executive Committee and as a member of the Capital Planning and Risk Management Committees. As such, the Company provides Defendant Cecere with his principal occupation for which he receives lucrative compensation. Therefore, as USB admits, Defendant Cecere is a non-independent director. As CEO and a director throughout the Relevant Period, Defendant Cecere was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company. In addition, Defendant Cecere solicited the 2022 and 2023 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As USB's highest officer and as a trusted Company director, he conducted little, if any, oversight of the schemes to cause USB to engage in the Account Misconduct and the Consumer Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Cecere is a defendant in the Securities Class Action. In addition, his insider sales, which saw him reap proceeds of over $20.1 million while the Company's stock price was artificially inflated due to the misrepresentations alleged herein, further demonstrate his

motive in facilitating and/or participating in the schemes. As a result, Defendant Cecere breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Therefore, demand upon him is futile and excused.

259.    Additional reasons that demand on Defendant Baxter is futile follow. Defendant Baxter has served as a USB Board member since December 2015 and is Chair of its Audit Committee and a member of its Executive and Compensation and Human Resources Committees. Defendant Baxter has received and continues to receive significant compensation for his role as a director as described above. In addition, Defendant Baxter solicited the 2022 and 2023 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a trusted USB director, he conducted little, if any, oversight of the schemes to cause USB to engage in the Account Misconduct and the Consumer Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Baxter breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and thus demand upon him is futile and, therefore, excused.

260.    Additional reasons that demand on Defendant Bridges is futile follow. Defendant Bridges has served as a member of the USB Board since October 2018. She also serves as Chair of the Public Responsibility Committee and as a member of the Executive Committee and Risk Management Committee. Defendant Bridges has received and continues to receive significant compensation for her role as a director as described above. In addition,

Defendant Bridges solicited the 2022 and 2023 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. As a trusted USB director, she conducted little, if any, oversight of the schemes to cause USB to engage in the Account Misconduct and the Consumer Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Bridges breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and thus demand upon her is futile and, therefore, excused.

261.    Additional reasons that demand on Defendant Buse is futile follow. Defendant Buse has served as a Company director since June 2018. She also serves as Chair of the Capital Planning Committee and as a member of the Audit Committee. Defendant Buse has received and continues to receive significant compensation for her role as a director as described above. In addition, Defendant Buse solicited the 2022 and 2023 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. As a trusted USB director, she conducted little, if any, oversight of the schemes to cause USB to engage in the Account Misconduct and the Consumer Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Buse breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and thus demand upon her is futile and, therefore, excused.

262.    Additional reasons that demand on Defendant Ellison-Taylor is futile follow. Defendant Ellison-Taylor has served as a member of the USB Board since January 2021. She also serves as a member of the Audit Committee and the Public Responsibility Committee. Defendant Ellison-Taylor has received and continues to receive significant compensation for her role as a director as described above. In addition, Defendant Ellison-Taylor solicited the 2022 and 2023 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. As a trusted USB director, she conducted little, if any, oversight of the schemes to cause USB to engage in the Account Misconduct and the Consumer Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Ellison-Taylor breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and thus demand upon her is futile and, therefore, excused.

263.    Additional reasons that demand on Defendant Harris is futile follow. Defendant Harris has served as a member of the USB Board since October 2014 and serves as Chair of the Governance Committee and as a member of the Compensation and Human Resources Committee and Executive Committee. Defendant Harris has received and continues to receive significant compensation for her role as a director as described above. In addition, Defendant Harris solicited the 2022 and 2023 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. As a trusted USB director, she conducted little, if any, oversight of the schemes to

cause USB to engage in the Account Misconduct and the Consumer Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Harris breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and thus demand upon her is futile and, therefore, excused.

264.   Additional reasons that demand on Defendant Hernandez is futile follow. Defendant Hernandez has served as a member of the USB Board since January 2012. Defendant Hernandez also serves as a member of the Executive Committee, Governance Committee, and Compensation and Human Resources Committee. Defendant Hernandez has received and continues to receive significant compensation for his role as a director as described above. In addition, Defendant Hernandez solicited the 2022 and 2023 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a trusted USB director, he conducted little, if any, oversight of the schemes to cause USB to engage in the Account Misconduct and the Consumer Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Hernandez breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and thus demand upon him is futile and, therefore, excused.

265.   Additional reasons that demand on Defendant McKenney is futile follow. Defendant McKenney has served as a member of the USB Board since October 2017. He also

serves as a member of the Executive Committee, Governance Committee, and Risk Management Committee. Defendant McKenney has received and continues to receive significant compensation for his role as a director as described above. In addition, Defendant McKenney solicited the 2022 and 2023 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a trusted USB director, he conducted little, if any, oversight of the schemes to cause USB to engage in the Account Misconduct and the Consumer Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant McKenney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and thus demand upon him is futile and, therefore, excused.

266.    Additional reasons that demand on Defendant Mehdi is futile follow. Defendant Mehdi has served as a member of the USB Board since June 2018. Defendant Mehdi also serves as a member of the Public Responsibility Committee and Risk Management Committee. Defendant Mehdi has received and continues to receive significant compensation for his role as a director as described above. In addition, Defendant Mehdi solicited the 2022 and 2023 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a trusted USB director, he conducted little, if any, oversight of the schemes to cause USB to engage in the Account Misconduct and the Consumer Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement

in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Mehdi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and thus demand upon him is futile and, therefore, excused.

267.    Additional reasons that demand as to Defendant Wiehoff is futile follow. Defendant Wiehoff has served as a member of the USB Board since January 2020. Defendant Wiehoff also serves as a member of the Capital Planning Committee and Risk Management Committee. Defendant Wiehoff has received and continues to receive significant compensation for his role as a director as described above. In addition, Defendant Wiehoff solicited the 2022 and 2023 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a trusted USB director, he conducted little, if any, oversight of the schemes to cause USB to engage in the Account Misconduct and the Consumer Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Wiehoff breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and thus demand upon him is futile and, therefore, excused.

268.    Additional reasons that demand as to Defendant Wine is futile follow. Defendant Wine has served as a member of the USB Board since July 2014. Defendant Wine also serves as a member of the Governance Committee and Executive Committee and as Chair of the Compensation and Human Resources Committee. Defendant Wine has received and continues to receive significant compensation for his role as a director as described above. In

addition, Defendant Wine solicited the 2022 and 2023 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a trusted USB director, he conducted little, if any, oversight of the schemes to cause USB to engage in the Account Misconduct and the Consumer Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Wine breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and thus demand upon him is futile and, therefore, excused.

269.    Additional reasons that demand on the Board is futile follow.

270.    Each of the Director Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay over $1 billion for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

271.    Defendants Baxter, Buse, Ellison-Taylor, and Wine (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. In violation of the Charter, Defendants Baxter, Buse, Ellison-Taylor, and Wine failed to adequately review and discuss the Company's Forms 10-K; failed to adequately exercise their

risk management and risk assessment functions, including as each pertained to the Account

Misconduct and Consumer Misconduct; and failed to ensure adequate Board oversight of the

Company's internal control over financial reporting, disclosure controls and procedures, and

Code of Ethics. Thus, Defendants Baxter, Buse, Ellison-Taylor, and Wine further breached

their fiduciary duties, are not disinterested, and demand is excused as to them.

272.    In violation of the Code of Ethics, the Director Defendants engaged in or

permitted the schemes to cause the Company to engage in the Account Misconduct and the

Consumer Misconduct and to issue materially false and misleading statements to the public,

and to facilitate and disguise the Individual Defendants' violations of law, including breaches

of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of

corporate assets, and violations of Sections 10(b), 20(a), and 14(a) of the Exchange Act. In

violation of the Code of Ethics, the Director Defendants failed to avoid conflicts of interest or

the appearance of conflicts of interest; maintain the accuracy of Company records; protect

and ensure the efficient use of Company assets; comply with all applicable laws, rules, and

regulations; prevent the Company from participating in the Account Misconduct and the

Consumer Misconduct; and properly report violations of the Code of Ethics and applicable

laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of

liability and demand is futile as to them.

273.    USB has been and will continue to be exposed to significant losses due to the

wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits

against the Individual Defendants or others who were responsible for that wrongful conduct

to attempt to recover for USB any part of the damages USB suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

274.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

275.    The acts complained of herein constitute violations of fiduciary duties owed by USB's officers and directors, and these acts are incapable of ratification.

276.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of USB. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of USB, there would be no directors' and officers' insurance protection. Accordingly, the Director

Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

277.   If there is no directors' and officers' liability insurance, then the Director Defendants will not cause USB to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

278.   Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

279.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

280.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security

(other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

281.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

282.    Under the direction and watch of the Individual Defendants, the 2022 and 2023 Proxy Statements failed to disclose that, contrary to the 2022 and 2023 Proxy Statements' descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, were participating in and/or facilitating the Company's participation in the Account Misconduct and the Consumer Misconduct, and were failing to abide by the Company's Code of Ethics.

283.    The 2022 and 2023 Proxy Statements were also false and misleading as they failed to disclose, *inter alia*, that: (a) the Company was engaging in the Account Misconduct and the Consumer Misconduct; (b) due to the foregoing,  USB faced a foreseeable risk of greater regulatory scrutiny or investigation; (c) the Company's revenues were in part the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

284.    In exercising reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements within the 2022 and 2023 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the various matters that were set forth in the 2022 and 2023 Proxy Statements, including but not limited to, the reelection of various of the Director-Defendants to the Board.

285.    The false and misleading elements of the 2022 and 2023 Proxy Statements led to, among other things, the reelection of Defendants Baxter, Bridges, Buse, Cecere, Ellison-Taylor, Harris, Hernandez, McKenney, Mehdi, Wiehoff, and Wine to the Board, which allowed them to continue to breach their fiduciary duties to USB.

286.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 and 2023 Proxy Statements.

287.    Plaintiff, on behalf of USB, has no adequate remedy at law.

## SECOND CLAIM
### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

288.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

289.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding USB. Not only is USB now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon USB by the Individual Defendants. With the price of its common stock trading at artificially inflated prices

110

due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase hundreds of millions of its own shares at artificially inflated prices, damaging USB.

290.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

291.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about USB not misleading.

292.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by USB.

293.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available

111

to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

294.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

295.    Plaintiff, on behalf of USB, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

296.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

297.    The Individual Defendants, by virtue of their positions with USB and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of USB and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause USB to engage in the illegal conduct and practices complained of herein.

298.    Plaintiff, on behalf of USB, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

299.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112

300.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of USB's business and affairs.

301.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

302.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of USB.

303.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Account Misconduct and the Consumer Misconduct.

304.    In breach of their fiduciary duties owed to USB, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (a) the Company was engaging in the Account Misconduct and Consumer Misconduct; (b) due to the foregoing,  USB faced a foreseeable risk of greater regulatory scrutiny or investigation; (c) the Company's revenues were in part the result of unlawful conduct and thus not maintainable; and (d) the Company failed to maintain internal controls. In light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

305.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

306.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

307.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

308.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, including the Account Misconduct and the Consumer Misconduct, and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of USB's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent it from continuing to occur.

309.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

310.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, USB has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

311.    Plaintiff, on behalf of USB, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

312.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

313.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, USB.

314.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from USB that was tied to the performance or artificially inflated valuation of USB, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

315.    Plaintiff, as a shareholder and a representative of USB, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

316.    Plaintiff, on behalf of USB, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

317.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115

318.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence USB, for which they are legally responsible.

319.    As a direct and proximate result of the Individual Defendants' abuse of control, USB has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, USB has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

320.    Plaintiff, on behalf of USB, has no adequate remedy at law.

## <u>SEVENTH CLAIM</u>
### Against the Individual Defendants for Gross Mismanagement

321.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

322.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of USB in a manner consistent with the operations of a publicly-held corporation.

323.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, USB has sustained and will continue to sustain significant damages.

324.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

325.    Plaintiff, on behalf of USB, has no adequate remedy at law.

**EIGHTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

326.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

327.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

328.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused USB to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

329.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

330.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

331.    Plaintiff, on behalf of USB, has no adequate remedy at law.

**NINTH CLAIM**
**Against Defendants Cecere, Dolan, Richard, and Quinn for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

332.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117

333.    USB, Defendant Cecere, Defendant Dolan, Defendant Richard, and Defendant Quinn are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Cecere's, Dolan's, Richard's, and Quinn's willful and/or reckless violations of their obligations as officers and/or directors of USB.

334.    Defendant Cecere, Defendant Dolan, Defendant Richard, and Defendant Quinn, because of their positions of control and authority as officers and/or directors of USB, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of USB, including the wrongful acts complained of herein and in the Securities Class Action.

335.    Accordingly, Defendants Cecere, Dolan, Richard, and Quinn are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

336.    As such, USB is entitled to receive all appropriate contribution or indemnification from Defendants Cecere, Dolan, Richard, and Quinn.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of USB, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to USB;

(c)    Determining and awarding to USB the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing USB and the Individual Defendants to take all necessary actions to reform and improve USB's corporate governance and internal procedures to comply with applicable laws and to protect USB and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of USB to nominate at least seven candidates for election to the Board; and

119

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)  Awarding USB restitution from the Individual Defendants, and each of them;

(f)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)  Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 11, 2024

**THE BROWN LAW FIRM, P.C.**

*/s Timothy Brown*
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
       shashmi@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296

120

Email: peretz@bgandg.com
eitank@bgandg.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Cheri Clearwater, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11 day of January, 2024.

DocuSigned by:

*Cheri Clearwater*

343C5D8C7CE142D...

Cheri Clearwater